No. 46,583

IN THE MATTER OF THE GUARDIANSHIP OF THE PERSON AND ESTATE OF E. SYDNEY SMITH, a Minor, E. SYDNEY KOCH, formerly E. SYDNEY SMITH, *Appellant,* v. MERCHANTS MUTUAL BONDING COMPANY and MILFORD M. MAGEE, *Appellees.*

(507 P. 2d 189)

Opinion filed March 3, 1973.

*Howard A. Spies,* of the firm of Schroeder, Heeney, Groff & Spies, of Topeka, argued the cause, and *Stephen M. Todd,* of the same firm, was with him on the brief for the appellant.

*David H. Fisher,* of the firm of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause and was on the brief for appellee, Merchants Mutual Bonding Company.

The opinion of the court was delivered by

FONTRON, J.: The train of events leading up to this lawsuit had its origin in the appointment of Milford M. Magee as guardian of the person and estate of E. Sydney Smith, a minor. Miss Smith has since reached legal age and is, we are advised, now married. As required by the provisions of K. S. A. 59-1101 Mr. Magee, upon his appointment, provided a surety bond in the principal sum of $17,500, this amount being, we are entitled to assume, not less than 125 percent of the value of the personal property and probable income from the real property which should come into his possession. The guardian's bond was executed by the Merchants Mutual Bonding Company, as surety, the company being referred to hereafter as surety or bonding company, and it was conditioned that Magee should faithfully discharge all the duties of his trust according to law.

This lawsuit raises issues with respect to the extent of the surety's liability under its bond. It is primarily contended by E. Sydney Smith, to whom we shall refer in this opinion as plaintiff, or ward, that the surety is obligated to pay double the amount converted by its principal under and by virtue of the provisions of K. S. A. 1972 Supp. 59-1704. The district court found in favor of the bonding company with respect to this contention, and the plaintiff has appealed from that decision.

A brief chronicle of the pertinent facts is in order. Letters of guardianship were issued to Magee on June 23, 1965, and his bond was approved by the court a few days later. Magee did not file an inventory of the assets of his ward's estate within thirty days as K. S. A. 1972 Supp. 59-1201 requires, nor did he at any other time file an inventory. On March 16, 1966, a petition was filed in probate court for his removal. Thereafter, and on May 27, 1966, Magee filed a petition for approval of his first and final accounting. Objection to the accounting was interposed by the ward. On June 23, 1966, Magee was removed as guardian and the Johnson County National Bank and Trust Company was appointed conservator of the ward's estate.

At this point in time the probate proceedings rested for a time pending disposition of a civil action which the ward filed in district court jointly against Magee, certain of his alleged partners, and the bonding company. On January 25, 1968, the district court dis-

missed the proceedings for lack of jurisdiction and activity was thereupon resumed in probate court. A hearing was held on Magee's final accounting February 27, 1968, after which the probate court on April 2, 1968, entered judgment finding that Magee had commingled funds of his ward with funds of his own; that Magee had converted the sum of $15,295.35 to his own use, of which amount $13,503.66 was paid to the conservator on August 12, 1966; and that the ward—then no longer a minor—was entitled to judgment against Magee and the bonding company in the amount of $15,545.35, less credit for the August payment. This judgment included a $250 fee paid by Magee to himself which the court disallowed. Magee appealed from this judgment but later dismissed his appeal.

On July 10, 1969, the bonding company tendered payment of $3414.20, this being the amount due plaintiff in addition to the $13,503.66 paid on August 12, 1966. This payment raised the total amount received by plaintiff to $16,917.86 and it encompassed interest on the sums which had been converted.

The record reflects that subsequent to the entry of the judgment on April 2, 1968, the plaintiff filed three petitions in probate court seeking double damages under K. S. A. 1972 Supp. 59-1704. The first petition was directed against Magee alone; the second and third against both Magee and the bonding company. Eventually, all three petitions arrived in district court, where they were consolidated for trial. The case was presented to the court on the following issues:

"1. Whether Milford M. Magee, the removed guardian, is liable to the ward E. Sydney Smith for an additional amount equal to the amount found by the Probate Court on April 2, 1968, to have been embezzled by him, pursuant to K. S. A. 59-1704.

"2. Whether K. S. A. 59-1704 was intended to be punitive or compensatory in its operation, and if the latter, whether the bonding company would be liable for all or any part of the damages accruing under K. S. A. 59-1704.

"3. Whether the payment of $13,503.66, made on August 12, 1966, was in fact made by Magee or by the bonding company, and if by Magee, whether the ward may elect to apply that sum toward the damages accruing under K. S. A. 59-1704."

The trial court ultimately held that Magee was liable to the plaintiff for double the value of the property found by the probate court to have been converted by Magee, i. e., $15,295.35; that K. S. A. 1972 Supp. 59-1704 is a penal statute and must be strictly construed;

that the bonding company was not liable under that statute for double the amount of the assets converted; and that it made no difference whether the $13,503.66 payment received by the ward on August 12, 1966, was made by Magee or by the bonding company.

Judgment was entered against Magee for the additional sum of $15,295.35. Magee has not appealed and we need concern ourselves no further with the trial court's determination of that issue. The remaining questions have more meat on their bones and are somewhat interlocking.

As before indicated, the fiduciary's bond, in the principal amount of $17,500, was given pursuant to K. S. A. 59-1101 which requires the filing of bond in an amount not less than 125 percent of the personal property and the probable income from real estate which shall come into the hands of the fiduciary. Under principles of general law the obligation of a bond is to be measured by the bond itself and may not be extended by implication or enlarged by construction beyond the terms of the executed contract. (50 Am. Jur., Suretyship, § 32, pp. 924, 925.) In 39 Am. Jur. 2d, Guardian and Ward, § 190, p. 143, it is said:

". . . The surety is bound only to the extent stated in the bond, even though the law may impose greater liability on the guardian. . . ."

In 72 C. J. S., Principal and Surety, § 92, p. 573, the general rule is similarly expressed:

". . . A surety may limit the amount of his liability where the intention to do so is apparent on the face of the contract, and, where his agreement is to be responsible for a certain amount, he cannot be held for amounts in excess of it."

See, also, *McMullen v. Loan Association*, 64 Kan. 298, 305, 67 Pac. 892; *Amerson v. Christman*, 261 C. A. 2d 811, 68 Cal. Rptr. 378.

This is not to say that the rule may never be subject to limited exceptions. By way of illustration, in *McMullen v. Loan Association*, supra, this court held:

"While the penalty of the bond fixes the limit of liability of the surety at the time the liability arises, yet if the principal or surety fail to discharge that liability when it matures, interest may be allowed on the amount from the time the liability arises, even if the amount of recovery shall exceed the penalty. (Syl. ¶ 4.)

The rationale of this holding is explained in this fashion:

". . . Interest is recoverable against both [principal and surety] . . . from the time of the default, not as a part of the penalty, but for the detention of the money after the same became due. . . ." (p. 304.)

In the present action, however, we have been unable to find any exceptions of like or comparable character.

The focal point of difference between the parties is over the nature of K. S. A. 1972 Supp. 59-1704 which provides as follows:

"If any person embezzles or converts to his own use any of the personal property of a decedent or conservatee, such person shall be liable for double the value of the property so embezzled or converted."

The bonding company contends the statute is punitive in effect and, being a penal or exemplary statute, that it does not apply to or impose liability upon sureties. If this construction be true, the bonding company asserts, then it has fully complied with its obligation under the bond, inasmuch as Magee's defalcation, plus interest thereon from the date of occurrence, has been made good. On the other hand the plaintiff views 59-1704 as a remedial statute, its purpose being, so it is argued, to compensate for loss occasioned by an unfaithful fiduciary. In advancing this argument the plaintiff concedes that a surety is not liable for punitive damages assessed against its principal.

We find it difficult to accept the plaintiff's theory that the statute, K. S. A. 1972 Supp. 59-1704, is compensatory in nature. In general, compensatory damages are awarded to make good or to replace loss caused by a wrong or injury; they are confined to compensating for injuries sustained. (See 25 C. J. S., Damages, § 17, p. 646.) In 22 Am. Jur. 2d, Damages, § 11, pp. 26, 27, we find compensatory damages defined as follows:

"Compensatory damages are damages in satisfaction of, or in recompense for, loss or injury sustained. The term covers all loss recoverable as a matter of right and includes all damages (beyond nominal damages) other than punitive or exemplary damages. The phrase 'actual damages' is sometimes used as synonymous with compensatory damages. . . ."

The rationale which undergirds the allowance of punitive damages is inherently different. Damages of this type are described in 22 Am. Jur. 2d § 236, p. 322, in these words:

"Exemplary, or punitive, damages are generally defined or described as damages which are given as an enhancement of compensatory damages because of the wanton, reckless, malicious or oppressive character of the acts complained of. Such damages go beyond the compensatory damages suffered in the case; they are allowed as a punishment of the defendant and as a deterrent to others. . . ."

The pronouncements of this court are in agreement with the general rule. More than once we have delineated the dominant

purpose to be served through imposition of punitive or exemplary damages. In *Motor Equipment Co. v. McLaughlin*, 156 Kan. 258, 274, 133 P. 2d 149, the objective to be obtained is clearly expressed:

". . . Punitive damages are imposed by way of punishing a defendant for malicious or vindictive acts or for a willful and wanton invasion of plaintiff's rights, the purpose being to restrain him and to deter others from the commission of like wrongs. (*Stalker v. Drake*, 91 Kan. 142, 136 Pac. 912; *Stoner v. Wilson*, supra.)"

Subsequent decisions of the court have echoed the same principle. In *Watkins v. Layton*, 182 Kan. 702, 705, 706, 324 P. 2d 130, we find it stated in this way:

"The earliest Kansas cases indicate that damages, sometimes called exemplary, vindictive or punitive, are permitted whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. (*Malone v. Murphy*, 2 Kan. 250; *Albert Wiley v. Keokuk*, 6 Kan. 94; and *Cady v. Case*, 45 Kan. 733, 26 Pac. 448.) Such damages are allowed not because of any special merit in the injured party's case, but are imposed by way of punishing the wrongdoer for malicious, vindictive or a willful and wanton invasion of the injured party's rights, the purpose being to restrain and deter others from the commission of like wrongs. (*Stalker v. Drake*, 91 Kan. 142, 136 Pac. 912; see, also, *Townsend v. Seefeld*, 102 Kan. 302, 169 Pac. 1157; and 15 Am. Jur., Damages, § 266, p. 700.) The reasons for the rule are fully discussed in *Albert Wiley v. Keokuk*, supra."

In a more recent case where the subject of punitive damages arose, *Brewer v. Home-Stake Production Co.*, 200 Kan. 96, 434 P. 2d 828, we commented tersely on the subject:

"In this state exemplary damages are not regarded as compensatory in any degree." (Syl. ¶ 1.)

Although this court has never expressly addressed itself to the liability of a bonding company for payment of exemplary damages within the context of K. S. A. 1972 Supp. 59-1704, we are not entirely without precedent in the general area. *Farmer v. Rutherford*, 136 Kan. 298, 15 P. 2d 474, is pertinent to the situation at hand. In that case the plaintiff sued a sheriff and his bondsmen to recover damages for injuries sustained as a result of an assault made upon his person. Exemplary, as well as actual, damages were asked. In ruling on the point involved here the court said:

". . . The rule is that a surety on an official bond can only be made to respond for actual or compensatory damages and is not liable for punitive or exemplary damages in the absence of a statute providing therefor. (46 C. J. 1070; 57 C. J. 1093, 1094.)" (p. 305.)

The ruling is cited with approval in *Estell v. New Amsterdam Cas. Co.*, 164 Kan. 712, 192 P. 2d 194.

What the court said in *Farmer* accords with what we believe is the general rule obtaining in this country. In Arnold, Suretyship and Guaranty, § 253, p. 404, we find the principle stated:

"The principal's act may justify recovery in tort against him which will include exemplary or punitive damages; but upon his bond only compensatory damages are recoverable. From this statement it is clear that a surety could not be held to pay any punitive damages. Usually exemplary damages are recoverable in tort actions only, while the action on the bond against principal or surety is one of contract. For a penalty prescribed by statute, a surety on the ordinary undertaking is not liable."

In most of the jurisdictions where this question has arisen, although not in all, it has been held that statutes which are similar or analogous to ours are penal in character, not compensatory. (See Anno: 29 A. L. R. 2d, Decedent's Property—Conversion, pp. 244, *et seq.*)

We have not overlooked the cases from other jurisdictions which the plaintiff has cited. None of them are concerned with the precise situation now before us and, in our judgment, they do not impair the validity of the conclusion we have reached.

Note has also been taken of *Atchison, T. & S. F. R. Co. v. State,* 22 Kan. 1, where a legislative act giving an informer half the penalties recovered against railroad companies for failure to ring a bell or blow a whistle at highway crossings, as required by law, was held to violate article 6, § 6 of the Constitution providing that fines for breach of penal laws go to support the common schools. The court equated the penalties provided for in the statute with fines imposed in general for breach of penal laws, and it correctly held that receipt by an informer of half the fines violated the constitutional mandate. The situation here is different. K. S. A. 1972 Supp. 59-1704 is a civil, not a criminal statute, and the penalty imposed thereunder is in redress of a civil wrong; it is not a fine in any criminal sense. The distinction, we believe, is important.

Because of certain language found in the *Atchison* case, its holding has been interpreted on rare occasions as applying generally to exemplary damages. We believe such an interpretation is unjustified and should be disavowed.

In our view the trial court was correct in deciding that K. S. A. 1972 Supp. 59-1704 is of an exemplary character and that a surety is not liable under its terms for payment of double the value of property converted by its principal. Having so decided, we turn to the final question posed: May the plaintiff apply the $13,503.66

received by her on August 12, 1966, to payment of the judgment entered in her favor against Magee on September 7, 1971? It will be recalled this judgment was in the amount of $15,295.35 and represented the double liability accruing under K. S. A. 1972 Supp. 59-1704.

The plaintiff predicates her argument on the rule that where a debtor owing two debts to the same creditor, one of them being secured, makes a payment without designating the debt to which the payment is to be applied, the creditor may apply the same to the debt which he selects, even though the debt selected perchance turns out to be, by coincidence, the debt which is unsecured. (*Coal & Lime Co. v. Construction Co.*, 97 Kan. 203, 154 Pac. 1012; *Lewis v. Texas Co.*, 158 Kan. 765, 150 P. 2d 160; 38 C. J. S., Guaranty, § 78, p. 1247.) We believe the rule is not applicable under the circumstances of the present case. Were it otherwise, what we have said the plaintiff could not recover from the surety directly, she could recover indirectly, for to permit her to credit the 1966 payment on the 1971 judgment for exemplary damages would leave unpaid, in part at least, the actual damages sustained, and would be, in effect, to subject the surety to payment of punitive damages. Such we hold to be impermissible as a matter of public policy.

Since exemplary damages, as we have endeavored to illustrate, are awarded not to enrich or reward a plaintiff but rather to serve as an object lesson both to a wrongdoer, himself, and to others who might be tempted to follow his wayward ways, the purpose they are intended to serve would be thwarted if the additional financial burden were cast upon innocent shoulders.

This view is found expressed in *American Surety Company of New York v. Gold*, 375 F. 2d 523, 525, 526, a case originating in this state. The case was concerned with liability of an insurance carrier to respond for punitive damages awarded against its insured. In a well reasoned opinion, Chief Judge Murrah points out that although Kansas had not spoken directly on the point, his court was convinced that Kansas courts "would hold a policy [of insurance] insuring against punitive damage awards to be violative of the public policy of that state." Judge Murrah went on to say that "if the wrongdoer is permitted to shift the incidence of the damages to his insurer, the stated purpose for such damages is frustrated."

In *Northwestern National Casualty Company v. McNulty*, 307 F. 2d 432, a case from which Judge Murrah quotes at some length, the Fifth Circuit Court of Appeals, had this to say:

"The argument that insurance against punitive damages would contravene public policy is sometimes said to rest on the doctrine that 'no one shall be permitted to take advantage of his own wrong.' Mr. Justice Cardozo in Messersmith v. American Fidelity Co., 232 N. Y. 161, 133 N. E. 432, 19 A. L. R. 876 (1921). That doctrine is not necessarily applicable to cases of automobile liability insurance governing punitive damages. In such cases the public policy against coverage is not so much to prevent encouragement of wrongdoing by obstructing the hopes of profit; it is rather to make effective the discouragement of wrong-doing by the imposition of punishment. Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct. It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent." (p. 440.)

As we have said, the issue of public policy present here has not directly confronted this court before, but even so we believe the position we take today was foreshadowed in *Farmer v. Rutherford,* supra, and *Estell v. New Amsterdam Cas. Co.,* supra. Reluctant reference is also made to the dissenting opinion in *Gowing v. Great Plains Mutual Ins. Co.,* 207 Kan. 78, 84, 483 P. 2d 1072, wherein the subject of public policy received passing mention.

We freely concede there is considerable diversity of opinion between the several jurisdictions of this country with respect to the matter of public policy, but we believe the better reasoned position is that espoused in the cases we have cited. Where exemplary damages are awarded for purposes of punishment and deterrence, as is true in this state, public policy should require that payment rest ultimately as well as nominally on the party who committed the wrong; otherwise they would often serve no useful purpose. The objective to be attained in imposing punitive damages is to make the culprit feel the pecuniary punch, not his guiltless guarantor. Compensatory damages, we might add, would not be affected by such a policy. They stand to be paid as any actual damages are cared for.

We find no error in the judgment of the court below and its judgment is affirmed.