(594 P.2d 241)

No. 49,215

SEAMAN UNIFIED SCHOOL DISTRICT NO. 345, SHAWNEE COUNTY, STATE OF KANSAS, A Public Corporation, *Plaintiff-Appellee,* v. CASSON CONSTRUCTION COMPANY, INC., a Kansas Corporation; and PLANET INSURANCE COMPANY, a Wisconsin Corporation, *Defendants and Third Party Plaintiffs-Appellants,* v. GLENN A. HORST, JOSEPH W. TERRILL and GARY G. KARST, d/b/a HORST, TERRILL AND KARST; POWER LOCK SYSTEMS, INC., and U. S. ENGINEERING COMPANY, INC., *Defendants and Third Party Defendants-Appellants.*

Opinion filed May 4, 1979.

*Eugene W. Hiatt,* of Hiatt, Crockett, Hiatt & Carpenter, Chartered, of Topeka, for appellants Casson Construction Company, Inc., and Planet Insurance Company.

*Herbert A. Marshall,* of Marshall, Hawks, McKinney & Hendrix, of Topeka, for appellant Horst, Terrill and Karst.

*William Hergenreter,* of Shaw, Hergenreter, Quarnstrom & Wright, of Topeka, for appellant U. S. Engineering Company, Inc.

*George A. Scott* and *Robert E. Keeshan,* of Scott, Quinlan & Hecht, of Topeka, for appellee.

Before FOTH, C.J., SPENCER and MEYER, JJ.

MEYER, J.: This is an appeal from a judgment holding defend-

ants jointly and severally liable for water damage caused to plaintiff's (Seaman's) gymnasium floor, on theories of express warranty and negligence, based on improper design and construction. Each defendant has appealed the court's rulings.

The primary question is which, if any, of the defendants in this case is liable for such damage. We must thus determine whether defendant Casson Construction Company, Inc. (Casson) is liable under a theory of either express warranty or negligence, or both; whether defendants Glenn A. Horst, Joseph W. Terrill, and Gary G. Karst, d/b/a Horst, Terrill and Karst (Architects) are liable for faulty design or faulty follow-up procedure, or both; and whether defendant U. S. Engineering Company, Inc. (Engineering) is liable for specific acts of negligence.

The damage occurred when water from heavy rains entered the newly constructed gym (which was constructed partially below grade) from the northwest stairwell, flooding the wood floor. The first such rain was on April 18, 1970, at which time more than two-thirds of the gym floor was covered by water. On May 14, 1970, a rain of somewhat less intensity again resulted in flooding of the gym floor. During yet another rain, in June of 1970, water entered the areaway but did not reach the gym floor.

Engineering's foreman had covered the top of a four-inch drain at the bottom of the stairwell with tape some time in October of 1969, but he had perforated the tape in a number of places prior to April 18, 1970. Casson completed the finish grading of the area surrounding the gym shortly before April 18, 1970. Following the April 18 flooding, the Engineering foreman removed the tape completely. Nonetheless, on May 14, the gym floor flooded again. Following the May 14 incident, Architects tore out and replaced the ten feet of sidewalk closest to the stairwell, adding a step and sloping the walk away from the stairwell. Casson made some changes in the grading. The surrounding area was ultimately regraded after June, 1970.

Turning first to the question of Casson's liability, we note the following express findings of the trial court:

"2. Plaintiff has sustained the burden of proving that Casson breached the express warranty that all work would be of good quality, free from faults and defects and in conformance with the contract documents in the following respects:

a. In failing to grade the area to the west of the gymnasium in conformance with the plans and specifications;

b. In failing to grade the area immediately to the north of the gymnasium and east of the sidewalk leading to the northwest areaway in conformance with the plans and specifications;

c. In failing to backfill the loose laid stone wall next to the northwest areaway with the type of material specified by the plans and specifications (i.e. clay).

"3. Plaintiff has sustained the burden of proving that Casson was negligent in the following respects:

a. In failing to grade the area to the west of the gymnasium in conformance with the plans and specifications;

b. In failing to grade the area immediately to the north of the gymnasium and east of the sidewalk leading to the northwest areaway in conformance with the plans and specifications;

c. In failing to backfill the loose laid stone wall next to the northwest areaway with the type of material specified by the plans and specifications (i.e. clay);

d. In failing to take all reasonable precautions to protect its work (i.e., the gymnasium floor) as required by Article 10.2.1 of the contract;

e. In failing to maintain northwest areaway free of debris on or about the 17th or 18th day of April, 1970.

"4. The foregoing acts of negligence on the part of Casson were direct, contributing and proximate causes of the damage to the gymnasium floor sustained by Seaman.

"5. Casson was not a 'general contractor' but merely a 'prime contractor.' The Court in construing the four corners of the contract in the instant case finds that such contract was a 'specified manner and method' contract as opposed to an 'end result' contract. (*Kansas Turnpike Authority v. Abramson*, 275 F.2d 711; par. 1, supra) Casson had fully completed the gymnasium floor in accordance with the plans and specifications and is, therefore, not liable to Seaman under a straight contract theory as set forth in the corrected memorandum decision and order filed September 21, 1976.

"6. The motion of Casson for involuntary dismissal at the close of plaintiff's case on the ground of election of remedies should be overruled for the reason that the theories of negligence and breach of express warranty are not inconsistent as the issues are framed and presented in the instant case. (*McFeeters v. Renollet*, 210 Kan. 158, 163)"

Thorough examination of the record on appeal reveals substantial competent evidence to support the trial court's finding that Casson's finish grading of the area surrounding the gymnasium was negligent and that this negligence caused or concurrently caused the damage to Seaman's gym. A survey on May 6, 1970, indicated that some 3,100 square feet of surrounding surface area drained into the stairwell; according to Architects' plans, 412 square feet of ground water should have drained into that well. Thus it is clear that Casson is liable in this case, and it remains for us to decide whether either Architects or Engineering, or both, are also liable.

As to Architects, the court made the following findings:

"8. Plaintiff has sustained the burden of proving that the Architects were negligent in requiring the sidewalk running south to the northwest areaway to slope to the south and thereby causing large amounts of water to collect in such areaway. Although Joe Shutter, the employee of Casson brought such obvious defect to the attention of Henry Lockard, the supervisor and employee of the Architects, the Architects refused to change their plans and specifications in this respect prior to the date the gymnasium floor was damaged by water on or about the 17th or 18th day of April, 1970.

"9. Such conduct on the part of Architects requiring the sidewalk to slope to the south directly into the areaway is negligence within the common knowledge of laymen and no expert testimony is required to establish such conduct constituted negligence on the part of Architects.

"10. Such negligence on the part of Architects was a direct, contributing and proximate cause of the water damage to the gymnasium floor on or about the 17th or 18th day of April, 1970.

"11. The gymnasium floor of plaintiff does not conform to the plans and specifications at the present time."

Architects argue that the trial court could not find that they were negligent without substantial competent expert testimony showing Architects' design and specifications did not meet applicable professional standards. They contend that interpretation of the varying slopes of the sidewalk and the surrounding lawn, in relation to proper drainage, required the testimony of an architect. Architects also argue that the technical elements involved are not common knowledge among non-architects, and the three architects who did testify (two of whom were with Architects' firm), all stated the design and specifications were within the local architectural standards. Architects urge application of a "professional community standard" like that applied in medical malpractice actions.

If, in a medical malpractice action, the plaintiff alleges the physician erred in the diagnosis or choice of treatment or application of medical expertise, expert medical testimony as to the accepted standard of medical care within the defendant's community is usually required for a proper determination of negligence. *Webb v. Lungstrum,* 223 Kan. 487, 575 P.2d 22 (1978); *Charley v. Cameron,* 215 Kan. 750, 528 P.2d 1205 (1974); *Williams v. Menehan,* 191 Kan. 6, 379 P.2d 292 (1963); *Voss v. Bridwell,* 188 Kan. 643, 659, 364 P.2d 955 (1961); *Goheen v. Graber,* 181 Kan. 107, 112, 309 P.2d 636 (1957). An exception to

this general rule exists when it is obvious within the common knowledge of laypersons that a different result would have been achieved had the defendant's performance been medically adequate. *Webb v. Lungstrum,* 223 Kan. 487; *Hiatt v. Groce,* 215 Kan. 14, 523 P.2d 320 (1974); *Collins v. Meeker,* 198 Kan. 390, 424 P.2d 488 (1967).

The "common knowledge" exception is usually applicable only in cases involving injuries outside the field of accepted medical treatment or those not involving the treatment per se. Where a healthy organ (limb, tooth) is removed rather than the diseased one, or where instruments or sponges are left in the patient's body after surgery, no expert medical testimony is necessary to create an inference of negligence. In such instances the fact finder's own common knowledge is sufficient to recognize a deviation from the accepted standard of care in the medical community.

One purpose of the community medical standard and its requirement of expert testimony is to educate the fact finder as to otherwise alien terminology and technology and thus preclude his rendering judgment on something he knows nothing about. We have no qualms in applying a similar standard to the architectural profession. We agree that architectural procedures are sufficiently technical and outside the realm of ordinary knowledge to warrant application of an "architectural community standard" in most instances. The "common knowledge exception," of course, would still be operable.

Three expert witnesses (*i.e.,* licensed, professional architects) testified on behalf of Architects. All three witnesses testified that the plans as originally designed and submitted by Architects conformed to the average standard of care used by architects in the Topeka area. One of the architects, on cross-examination, did state that Architects' plans did not strictly comply with AIA recommended standards. However, this same witness stated that the divergence of the plans from the AIA standards was slight and in his judgment did not constitute negligence on the part of Architects.

The trial court found Architects' plan constituted professional negligence as a matter of law. This conclusion was predicated on the fact that the sidewalk leading to the stairwell was designed to slope somewhat to the south, into the stairwell, and it is common

knowledge that water runs downhill. The facts of the drainage matter, however, are too technically complicated to be resolved by mere application of this commonly known fact. The evidence reveals that the plan provided the sidewalk leading to the northwest stairwell was to have a slope of one inch per ten feet to the south and one and one-half inches per ten feet to the *east.* The plan also specified a six-tenths of 1 percent overlawn slope to the north for the area immediately east of the walk. This water was not scheduled to run off in a direct line downhill but was to be shunted diagonally by the pitch of the sidewalk and then diverted to the north by the land contours and the plan-specified grade east of the walk. Considering these facts and the size of the surface area to be drained, we do not think it is within the common knowledge of laymen to decide whether such specifications were proper. This conclusion, together with the testimony of three architects that the plan was in accordance with local architectural standards and the absence of any testimony by an *architect* to the contrary, convinces us that the trial court erred in finding directly opposite to these experts' opinion testimony. For this reason, we reverse the judgment that Architects were jointly liable for Seaman's property damage.

We turn next to the question of whether Engineering was negligent. Engineering's on-site supervisor, Mr. Oshel, testified that some time prior to April 18, 1970, he cut holes in the tape covering the drain at the bottom of the stairwell. The morning after the April 18 flooding, Oshel pulled all the tape off the drain. Yet, on May 14, when there was less rainfall than on April 18, the gym floor again flooded.

No negligence can be ascribed to Engineering for initially placing the tape over the drain, as the drain pipe and cover were installed before the cement was poured in the stairwell. It was necessary to cover the drain to prevent first concrete, and later, dirt and other debris, from falling into the drain. Thus, Engineering's liability, if any, must be premised on either the failure to properly perforate the tape or to remove it entirely.

The fact that after the tape was removed flooding again occurred creates a strong inference that the flooding would have occurred on April 18 even if there had been no tape on the drain.

We find an additional reason why Engineering is not liable, based upon our interpretation of Article 10.2.1 of the Casson-Seaman contract, which reads as follows:

"10.2.1 The Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:
   .1   all employees on the Work and all other persons who may be affected thereby;
   .2   all the Work and all materials and equipment to be incorporated therein, whether in storage on or off the site, under the care, custody or control of the Contractor or any of his Subcontractors or Sub-subcontractors; and
   .3   other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction."

We interpret the language of subparagraphs .2 and .3 to mean Casson, as prime contractor, was responsible for policing the premises to avoid the kind of damage that occurred here. Casson's duty to inspect and to protect the work included the stairwell areaway and drain, following the completion of Engineering's work there. We think it unreasonable to hold that Engineering, having completed its work, had a duty to daily inspect the drains and keep them clear of debris and other material. Further, there was testimony that Casson's superintendent made daily on-site inspections of virtually the entire premises. He, if anyone, should have noted any obstructions in the areaway that might impede drainage and taken appropriate remedial steps. There was evidence that it had snowed or rained several times between October, 1969, and April 18, 1970, while tape was still covering the drain. There had been no drainage problems *after* holes were cut in the tape in October, 1969, and *before* Casson did its finish grading, sometime in April, 1970. Even if the trial court was correct in finding tape on the drain constituted negligence, such negligence was not shown to be a causative factor of Seaman's damage. We thus find the trial court erred in rendering judgment against Engineering.

The remaining issue is whether the damages in this case should be computed and assessed as of 1970, when the injury occurred, or as of 1976, the time of the trial. (Seaman's petition was eventually amended to ask for a larger amount than the award made by the trial court herein.) Defendants strenuously argue that the proper measure of damages must be determined as of the date the damage originally occurred. Seaman, on the other hand, contends it was lulled into a feeling of security by Casson's and

Architects' repeated assurances that the floor would be satisfactorily repaired or replaced at no additional cost to Seaman.

Considering the extreme inflationary trend between 1970 (when the damage occurred) and 1976 (when judgment was rendered), the date used to determine the proper measure of Seaman's damages will make a significant difference in the award. We feel, however, that Seaman, having established it is entitled to damages, should be "made whole." *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977), involved a dispute between royalty owners and their lessee, Mobil Oil Corporation, as to the "market value" of gas for the purpose of computing royalties. The plaintiffs had received judgments for additional royalties on gas produced by Mobil, based on the difference between the claimed market value of gas produced and the amount on which Mobil actually paid royalties. The Kansas Supreme Court noted the proper market value could not be determined until proof was shown by competent evidence, at trial. Until then, the plaintiffs' claim was unliquidated.

The court quoted the following language from 22 Am. Jur. 2d, Damages § 185:

"The general rule followed by some authorities is that interest as damages cannot, in the absence of any statutory provision therefor, be recovered as a matter of right in an action of contract upon an unliquidated claim. In a growing number of jurisdictions, however, the allowance of interest on such unliquidated claim is discretionary with the court, and interest will be allowed where required to give full compensation. Therefore, where necessary in order to arrive at fair compensation, the court, in the exercise of a sound discretion, may include interest or its equivalent as an element of damages." 221 Kan. at 468.

The court found that because Mobil had active use of money actually belonging to plaintiffs, while plaintiffs were deprived of the use, plaintiffs should be compensated. The trial court's award of interest on the "impounded" royalty money was accordingly upheld on principles of equity.

Admittedly the *Lightcap* factual situation is distinguishable from that of the instant case. Defendants here did not have the use of plaintiff's money (or of the property) during the six-year litigation, and the trial court essentially awarded cost-of-inflation as additional damages, rather than prejudgment interest. We think, however, that the equitable considerations underlying the *Lightcap* holding are equally appropriate and applicable to this case. Seaman has been deprived of the proper use of its gymna-

sium since April 18, 1970, through no fault of its own. Equity dictates they be put in as good a position as they would have been had the contract been satisfactorily performed—that is, with the grading properly finished according to the site plan and the gymnasium floor restored to the same condition it was before the injury occurred. Judgment for the amount necessary to repair or replace the floor in 1970 would not fairly compensate Seaman in 1976.

The trial court was vested with the discretion to consider elements of fairness and equity in arriving at adequate compensation for the plaintiff, and we fail to see any abuse of discretion in using the 1976 cost of restoration as the measure of damages. Although Seaman was given the benefit of inflation while Casson was awarded interest on the $5,000 still owed by Seaman, we do not find this distinction significant enough to disturb the trial court's determination.

The rationale of the above authorities, *coupled with defendants' assurances that Seaman would be made whole,* leads us to conclude the measure of damages as found by the trial court was correct.

The judgment of the trial court that Seaman's damages should be $40,400, offset by Seaman's unpaid balance owed Casson of $5,000 plus interest, as therein stated, is upheld and affirmed.

The trial court's judgment concerning the liability of Architects and Engineering is reversed. The degree of damages is approved, but Casson is adjudged to be solely liable rather than jointly and severally with Architects and Engineering, as found by the trial court.

Affirmed in part; reversed in part.