No. 55,254

WAUNETTA W. INGRAM, *et al., Appellees,* v. HOWARD-NEEDLES-TAMMEN AND BERGENDOFF, *Appellant,* and KANSAS TURNPIKE AUTHORITY, *Defendant.*

(672 P.2d 1083)

Opinion filed November 16, 1983.

*Herbert A. Marshall,* of Marshall, Hawks, Hendrix, Schenk and Nichols, of Topeka, argued the cause, and *Robert J. Perry,* of the same firm, was with him on the brief for the appellant.

*Edward M. Boyle,* of Payne & Jones, Chartered, of Olathe, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by Waunetta W. Ingram, on behalf of herself and the surviving children of Robert E. Ingram, to recover damages for his wrongful death and also to recover damages suffered by the decedent's estate which occurred prior to death. The facts in the case are not greatly in dispute and are essentially as follows: Robert E. Ingram died on February 20, 1979, as a result of fatal injuries suffered in an

accident which occurred on the Kansas turnpike in the city of Topeka. The decedent was driving a tractor and trailer truck across bridge No. 231, which was supposed to be maintained by the Kansas Turnpike Authority (KTA). After entering onto bridge No. 231, the truck struck a 4' by 5'6" hole on the bridge caused by deck deterioration in its final stages. This caused the truck to swerve, hit the guardrail, and plunge 25-30 feet to the ground. Ingram's truck burst into flames. Various witnesses on the scene observed the crash and attempted to remove Ingram from the cab of the truck. Their attempts were unsuccessful. The cab of the truck was in flames and the cries of Ingram for help could be heard. An explosion then occurred in the cab of the truck which consumed the life of Robert E. Ingram. The autopsy report states that the cause of death was "severe carbonization of the soft structures of the face and carbonization of the scalp." The report further states that the remainder of the deceased's body was badly burned, showing third-degree burns on its entire surface.

The Kansas turnpike was opened for travel in 1956. KTA hired the defendant-appellant, the firm of Howard-Needles-Tammen & Bergendoff (Howard-Needles), to serve as its consulting engineers. As one of their duties, the Howard-Needles engineers performed an annual inspection of all the bridges and other facilities of which the turnpike is comprised. Prior to the construction of the turnpike, the KTA entered into a trust agreement with Guaranty Trust Company of New York and Fourth National Bank of Wichita, as cotrustees. The trust agreement is dated October 1, 1954. The trust agreement required KTA to employ an engineering firm "having a nation-wide and favorable repute for skill and experience" to perform the duties required by the trust agreement. Howard-Needles performed its first annual inspection in August of 1957, and each year thereafter performed a similar inspection. After each inspection, Howard-Needles filed a report of its findings with KTA in a published report. The 1978 inspection was performed by Lowell Renner and Stephen Pellegrino on behalf of Howard-Needles. The report of their findings was made to KTA on October 25, 1978. In addition to employing a consulting engineering firm, KTA retained and employed a chief engineer and staff who were responsible for the maintenance and repair of the turnpike on a day-to-day basis.

Howard-Needles had no responsibility in the daily operations, maintenance, and repair of the turnpike.

Following the death of Robert E. Ingram, the plaintiff filed her petition in Shawnee County District Court on November 15, 1979. The only named defendant was KTA. In her petition, she asserted not only a wrongful death action but also a survival action on behalf of the estate of Robert E. Ingram. On September 5, 1980, following discovery, the trial court granted plaintiff leave to include as an additional party defendant, Howard-Needles, the consulting engineering firm, which had offices in Kansas City, Missouri, and at other locations throughout the United States. After various pretrial conferences and motions, the matter was set for trial to a jury on April 12, 1982. On the morning of the trial, plaintiff and defendant KTA notified the court that all claims of plaintiff against KTA had been settled and compromised. The case then proceeded to trial by jury against the remaining defendant Howard-Needles. KTA remained as a party only for the purpose of consideration of its comparative negligence.

On April 16, 1982, the jury returned a verdict determining the comparative fault of the parties, finding the accident and the resulting death of Robert E. Ingram to be 75% the fault of Howard-Needles and 25% the fault of KTA. The jury assessed damages in favor of the estate of Robert E. Ingram for damages accruing prior to death in the amount of $350,000. The jury assessed the damages suffered by the heirs of Robert E. Ingram to be $25,000 for limited nonpecuniary damages and $335,000 by way of pecuniary damages.

On April 20, 1982, defendant Howard-Needles filed motions for a new trial, for judgment notwithstanding the verdict, and for an order of remittitur. The district court denied these motions, upholding the verdicts of the jury in all respects. The trial court entered final judgments in accordance with the jury's verdicts. Defendant Howard-Needles appealed. The questions on appeal involve the usual liability issues which arise in negligence cases and also an attack on the amount of damages awarded by the jury.

In the area of liability, defendant Howard-Needles, in its post-trial motions before the trial court and again on this appeal, raises the following basic questions for determination:

■ What legal duty, if any, was owed by the consulting engi-

neers, Howard-Needles, to Ingram as a traveler on the Kansas turnpike, *in making annual inspections of turnpike bridges?*

█ What was the standard of care required of the defendant to be used in determining whether the defendant breached its legal duty?

█ Is there substantial evidence in the record to show that the defendant breached *its legal duty by failing to perform in com-pliance with the standard of due care?*

█ Is there substantial evidence in the record to show that defendant's breach of duty was a contributing cause to the decedent's injuries and death, and resulting damages suffered by the estate and heirs?

Defendant Howard-Needles also maintains that the amount of damages awarded by the jury was so excessive as to show passion and prejudice by the jury as a matter of law, and thus, a new trial should be granted defendant or a remittitur of damages ordered. Defendant also claims that the trial judge and opposing counsel were guilty of misconduct which denied Howard-Needles a fair trial. We will consider each of these issues separately.

### The Duty of the Inspecting Engineers to a Member of the Traveling Public

In regard to the question of a legal duty owed by Howard-Needles to the decedent Ingram, as a member of the traveling public, Howard-Needles maintains that it fulfilled all of its implied obligations and duties under the employment contract and under the trust agreement, and thus, as a matter of law, had no legal obligation or duty to the decedent or his heirs in making the annual inspections of turnpike bridges.

Simply stated, it is the position of Howard-Needles that it was employed to perform a *visual inspection of the turnpike bridges on behalf of the bondholders,* and that, under the trust agree-ment, it was required to perform no more than visual inspection of the bridges which its engineers proceeded to do. It argues that it is not a guarantor or insurer of its work or of the public safety. It maintains that, as a consulting engineer, it had no duty and hence no liability to the plaintiff as a matter of law, since there was no privity existing between it and the traveling public. The district court rejected this contention and we agree.

We have concluded that Howard-Needles had a legal duty to exercise reasonable care in conducting an annual safety inspec-tion which it owed to the decedent, Ingram, and to other mem-

bers of the traveling public. It has been held that the Kansas Turnpike Authority is an arm or agency of the State, created by the legislature to perform an essential governmental function. *Flax v. Kansas Turnpike Authority*, 226 Kan. 1, 596 P.2d 446 (1979). The Kansas statutes which created KTA, K.S.A. 68-2001 *et seq.*, clearly recognize that KTA has a duty to exercise its powers for the benefit of the people of this State and to maintain the turnpike in a condition of safety for the traveling public. In this regard, we note that K.S.A. 68-2013 declares that the exercise of the powers granted by the act will be in all respects for the benefit of the people of the State. K.S.A. 68-2015 and 68-2043 declare that each turnpike project when constructed and opened to traffic shall be maintained and kept in good condition and repair by the authority. We also note that K.S.A. 68-2004, dealing with the general grant of powers to KTA, declares in section (l) that KTA will employ consulting engineers and other employees as may be necessary in its judgment. Thus, consulting engineers employed to make safety inspections are employed pursuant to authority granted by statute and independently of any trust agreement involving the bondholders.

The trust agreement, in section 504 which deals with the duties of the consulting engineers, specifically requires the consulting engineers to make an inspection of the turnpike at least once in each year on or before the first of October, to submit to the authority a report setting forth their findings whether the turnpike has been maintained in good repair, working order, and condition, and to make recommendations as to conditions, maintenance, and repair of the turnpike during the ensuing year. In each of its annual inspection reports for the years 1973 through 1978, which are included in the record on appeal, Howard-Needles states in the introduction to each report that the entire turnpike has been given a close and complete inspection by its consulting engineers and architects and that particular attention was given "to items which might impose a hazard to public safety or result in increased future maintenance if not promptly corrected." Furthermore in a published report dated March 1977, to KTA, which report is entitled "Reconstruction & Renewal Program 1977 through 1987," the importance of bridge maintenance is emphasized in the following language:

"Maintenance of bridges carrying Turnpike traffic is of the utmost importance

to the operation of the Turnpike. There can be a failure of the roadway pavement without serious danger to the patrons, and a suitable detour could be provided quickly. However, a failure of a bridge could cause loss of life. The safety of the bridges is not necessarily apparent to the Turnpike patron. The safety of the structures is apparent, however, to the structural engineers who regularly perform the annual inspections."

In that report, Howard-Needles states that several inspection methods have been used in the evaluation of deck deterioration. Among the methods mentioned is use of a machine which scans the bridge deck in search of laminations or separations within the concrete deck. Another method utilizes an electrical-resistant corrosion detection device. The third method requires the prior removal of the asphalt wearing surface and a visual-audio technique of inspection. This report is important because it clearly shows that Howard-Needles recognized the importance of its safety inspections for the protection of the traveling public and that more than a simple visual inspection is contemplated.

At the trial, several professional engineers and inspectors were called to the witness stand. They testified that in making bridge inspections they have in mind not only their obligation to the bondholders but also the safety of the public. There is also in the record a letter dated November 5, 1956, in which Howard-Needles submitted its proposal for engineering services to the KTA. The language of this letter states generally that Howard-Needles shall make an annual inspection of the turnpike as to the physical condition thereof with a report summarizing findings and making recommendations for proper maintenance and repair. At no place in the letter does Howard-Needles limit its inspections to visual inspections, nor does it indicate that its inspections are to be made solely for the protection of the bondholders and not for the traveling public.

It is clear, from the statutory provisions set forth above, that the Kansas Turnpike Authority has a statutory duty to keep the bridges on the Kansas turnpike in good repair and to take whatever steps are reasonably necessary, including the proper inspection of bridges, to achieve that result. The question is then presented as to the existence and nature of any legal duty owed by Howard-Needles, as consulting engineers who have contracted to make the annual inspections of the turnpike bridges, to third parties including members of the traveling public. That legal duty has clearly been established by the decision of this

court in *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982), where this court judicially adopted, as the law of Kansas, Restatement (Second) of Torts § 324A (1965), which provides as follows:

"§ 324A. Liability to Third Person for Negligent Performance of Undertaking

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

In *Schmeck*, the Kansas City Power and Light Company, which had contracted to maintain the traffic control system for the city of Shawnee, argued that it owed no duty to the members of the traveling public for three reasons:

(1) Its only obligation was contractual, and, having contracted with the city, no duty was created for the benefit of the plaintiff;

(2) A contractor owes no duty to the general public for legal nonfeasance or failure to act; and

(3) The plaintiff's recovery must be based on some sort of negligent breach of contract by KCPL.

The court rejected each of these contentions, holding that Restatement (Second) of Torts § 324A applied. The opinion cited prior Kansas cases which recognize that public policy considerations impose a duty upon parties to private contracts, running to third persons, where negligence in performance creates a danger to the general public.

Clearly, in the case now before us, Howard-Needles, as consulting engineers, contracted to render services to KTA by making annual safety inspections which the consulting engineers should have recognized were necessary for the safety of the traveling public. Under the principles of law adopted in *Schmeck*, Howard-Needles owed a duty to the members of the traveling public, including Robert E. Ingram, to exercise reasonable care in providing safety inspection services. In this regard, we also note the annotation at 6 A.L.R.2d 284 which cites cases holding there is liability to third persons for breach of an assumed duty to inspect property where danger to the public

may be involved. We hold that defendant Howard-Needles, as consulting engineers, had a legal duty to members of the traveling public, including Robert E. Ingram, to exercise reasonable care in providing safety inspections for the turnpike bridges.

## The Standard of Care Required in Making Inspections of Bridges

The second issue presented is this: What was the standard of care required of Howard-Needles in order to fulfill its duty to the traveling public to exercise reasonable care in making annual bridge inspections? Howard-Needles contends that only a visual inspection was required and that it was not required to conduct follow-up tests. The plaintiff contends that professional engineering standards have been established which require more than a mere visual inspection of a bridge. At the trial, the duty to protect the safety of the public by following proper engineering standards for the inspecting of bridges was recognized without contradiction by the professional witnesses. There was substantial evidence presented to prove the standard of care required of professional engineers for inspection of bridges with concrete decks. There was introduced into evidence, as an exhibit, the "Manual for Maintenance Inspection of Bridges 1978" prepared by the Highway Subcommittee on Bridges and Structures of the American Association of State Highway and Transportation Officials.

Section 2.4.2 governs inspection procedures and states in part as follows:

"**2.4.2 Inspection Procedures.** The inspection should include but not necessarily be limited to the following observations:

. . . .

"(10) *Deck*.

. . . .

"Concrete decks must be checked for cracking, leaching, scaling, pot-holing, spalling, and other evidence of deterioration. Each item must be evaluated to determine its effect on the structure and the work required to restore the loss of structural integrity and maintain a smooth riding surface. Evidence of deterioration in the reinforcing steel must be examined closely to determine its extent. Decks which are treated with deicing salts or are located in a salt air environment are especially apt to be affected.

"Asphaltic or other type wearing surface on a deck may hide defects in the deck until they are well advanced. The surfacing must be examined very carefully for evidence of deterioration in the deck. Such defects may show as cracking or breaking up of the surfacing or in excessive deflection. *Areas where deck deterioration is suspected may require removal of small sections of the*

*surfacing for a more thorough investigation.* The underside of the deck slab should always be examined for indications of deterioration or distress. Note any evidence of water passing through cracks in the slab. When permanent forms have been used in construction of the deck, panels should be removed as determined by the Engineer." (Emphasis supplied.)

The standard of care was also shown by the testimony of various professional witnesses called both by the plaintiff and by the appellant. Defendant's expert, Thorn, the architect-engineer who designed the particular bridge deck in question, testified that the standard followed in inspection of bridges with concrete decks similar to this bridge was the "Manual for Maintenance Inspection of Bridges" mentioned above. He noted that the standards require the removal of small pieces of the slab for a more thorough inspection where areas of deterioration are suspected. In this regard, he testified that it would be appropriate to remove a section of asphalt to make a more thorough inspection of the concrete underneath. Mr. Shedd, who was the Howard-Needles employee in charge of inspections, testified as to various tests used in the inspection of bridge decks including a number of audio and electrical procedures. He testified that, if a visual inspection suggests bridge deterioration, then the inspector could go to the next inspection step. He stated, without equivocation, that the manual introduced into evidence is the authoritative source of standards followed by his profession in the inspection of bridges.

Other expert witnesses were called who testified, without exception, that the standard for bridge inspection is first a "careful visual inspection." However, they agreed that a careful visual inspection may reveal certain deficiencies in the bridge or may lead to a suspicion of deficiencies to the extent that the inspector should go beyond the "careful visual inspection" and perform other tests to satisfy himself as to the condition of the bridge deck. Clearly under the evidence, the jury would have been justified in concluding that the standard for bridge inspections in the engineering *profession* begins with a "careful visual inspection" with follow-up tests or other forms of inspection which would be more likely to reveal the true condition of the bridge deck. The testimony of the expert witnesses further indicated that, in performing inspections, other factors should be taken into consideration. Such factors would include the history of the bridge, the traffic flow across the bridge, its prior reported

condition, and other areas of suspicion concerning deck deterioration. Stated simply, there was substantial evidence from which the jury could have concluded that the standard of care required of a professional engineer in inspecting a bridge required more than a simple visual inspection.

### Evidence that Defendant Breached Its Legal Duty by Failing to Conform to the Required Standard of Care

The defendant next contends that its post-trial motions should have been sustained, because there was no substantial evidence in the record to prove that the defendant breached its duty by failing to make more than a visual inspection or by failing to make an adequate report of inspections. A review of the record shows that the defendant's bridge inspectors, Lowell Renner and Stephen Pellegrino, admitted that they had made only a visual inspection with no follow-up test because they were specifically told by their supervisor to make only a visual inspection. The testimony showed that there were approximately 345 bridges in the Kansas turnpike system. The jury was informed that the inspection made by Renner and Pellegrino of those 345 bridges and all of the facilities of the Kansas turnpike system was accomplished in a period of approximately five days. Suffice it to say, the jury had before it substantial evidence from which it could have concluded that the inspection of bridge No. 231 was done in a negligent manner. The various reports of Howard-Needles reflect that the deck of bridge No. 231 showed severe deterioration from 1964 through 1974 in the specific area that failed at the time of Robert E. Ingram's death. Ten years prior to the accident, a Howard-Needles report contained a recommendation that tests be made for the purpose of considering whether deck replacement was advisable. Further reports, while reflecting that some minor repairs to the bridge deck were accomplished, did not reflect that further inspections or repairs were ever performed. The reports for the years 1977-78 did not indicate any conditions of deterioration, nor did they recommend repairs to the bridge deck. The evidence was thus sufficient to show that defendant Howard-Needles, acting through its employees, failed to exercise reasonable care in inspecting bridge No. 231, where the fatal accident occurred.

The defendant's next point on the appeal is that its post-trial motions should have been sustained, because there was no

substantial evidence in the record to show that the defendant's breach of duty was a contributing cause to the decedent's injuries and death and to the resulting damages. We find this point to be without merit. Ordinarily, the question of whether a negligent act is the proximate or efficient cause of an injury is one for the jury. *Steele v. Rapp,* 183 Kan. 371, 383, 327 P.2d 1053 (1958). Here the testimony of expert witnesses established that the deck was severely deteriorated and that it was predictable that spalls and holes would appear therein. The evidence was sufficient to establish that the dangerous condition in the bridge deck due to deterioration could have reasonably occurred, as it did, prior to another visual inspection by Howard-Needles. In summary, the question as to whether defendant's negligence was a contributory cause of the accident was a determination to be made by the jury. The jury was justified in finding that it was a foreseeable consequence of defendant's negligence in failing to properly inspect the deck of bridge No. 231 and in failing to advise KTA of the deteriorated condition thereof, that injury would result therefrom to a traveler on the turnpike, and, therefore, that the defendant's negligence was the proximate cause of the injuries and death of the plaintiff's decedent.

The defendant next maintains that the jury's award of damages was so excessive as to show passion and prejudice of the jury as a matter of law, and that the defendant should be granted a new trial or a remittitur. This issue was considered by the trial court in determining defendant's post-trial motions and was rejected. In its memorandum opinion on the issue, the trial court pointed out that it is elementary law in damage actions that the assessment of unliquidated damages must rest in the sound discretion of the jury and the amount to be awarded is ordinarily a question for the jury. In *Kirk v. Beachner Construction Co., Inc.,* 214 Kan. 733, 736, 522 P.2d 176 (1974), the Kansas rule relating to excessive verdicts is set forth in syllabus ¶ 1 as follows:

"Where the charge of excessive verdict is based on the passion or prejudice of the jury and depends for support solely on the size of the verdict, the trial court will not be reversed for refusing a new trial, nor will a remittitur be ordered, unless the amount of the verdict in the light of the evidence shocks the conscience of the appellate court."

In the opinion, Justice Fontron points out that the rule, like many others in the field of law, is more difficult to apply than to

state. The difficulty, of course, when it comes to applying the rule, is simply this: What is unconscionable is not subject to precise and unequivocal definition. What is shocking to the conscience depends upon the amount of the verdict as related to the facts and circumstances of a given case. He notes that each case must stand on its own facts. The explanation for the lack of dollars and cents uniformity in Kansas cases is discussed in *Domann v. Pence*, 183 Kan. 135, 325 P.2d 321 (1958), as follows:

"Pain and suffering have no known dimensions, mathematical or financial. There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this very practical reason the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of the jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence." p. 141.

The trial judge, while noting that the verdict of the jury in this case was substantial, did not find it to be "outrageous or shocking to the conscience of the court." The court indicated that the jury verdict was reflective of the horrible manner in which Mr. Ingram met his untimely death. The evidence disclosed that Ingram survived the fall of his truck to the ground below and that, without doubt, he suffered greatly before he was ultimately consumed by the flames. The coroner's report showed that Mr. Ingram's death was caused by the carbonization of the soft structures of his face and scalp and deep burns of the entire body. The majority of this court agree with the trial court, and the jury's substantial award of $350,000, for conscious pain and suffering, did not indicate as a matter of law any passion or prejudice on the part of the jury. We hold that, under all of the circumstance, the award of $350,000 to the estate of Robert E. Ingram was "in harmony with the evidence."

As to the compensatory damages awarded by the jury to decedent's heirs in the amount of $360,000, the jury had before it evidence of the income of Robert Ingram, his age, his customary living expenses, and his expected earning capacity during the remainder of his life expectancy. We cannot say that the amount of $360,000 was so excessive as to indicate any passion and prejudice on the part of the jury or to shock the conscience of the court.

The defendant's final point is that a new trial should be granted because of misconduct of trial counsel and of the trial court. We have carefully considered the record in this regard and find this point to be without merit.

The judgment of the district court is affirmed.

SCHROEDER, C.J., dissenting: The testimony in this case established the death of Robert E. Ingram to have occurred almost instantaneously following the accident. One witness who observed the accident and attempted to free Ingram from the cab of the truck testified the decedent was moving around inside the cab of the truck and screaming for three to four minutes. Other witnesses who reached the truck and saw the explosion said Ingram succumbed to the flames after one to two minutes.

In its brief the appellant does not contend the damages awarded in the survival action for the decedent's pain and suffering amount to a windfall or double recovery to the plaintiff. The appellant merely asserts the plaintiff's total damages (for the wrongful death and survival actions combined) are so excessive they demonstrate passion and prejudice by the jury as a matter of law so that a remittitur should be ordered. The appellant bases this on the evidence presented to the jury consisting of pictures of the decedent's charred body, the testimony of witnesses describing the decedent's screams of agony prior to his death, and the coroner's report indicating the cause of death was severe burns to the face and head.

Prior Kansas cases have not addressed the inequity which results when the heirs of a decedent are permitted to assert both a claim for wrongful death (for loss of support, et cetera) and a survival action on behalf of the decedent (for pain and suffering experienced prior to death) in situations presented by the facts of this case. Most states by statute allow both actions to be brought, including Kansas. See K.S.A. 60-1801 *et seq.* (survival action) and K.S.A. 60-1901 *et seq.* (wrongful death action). Most courts which have addressed the issue have held the two actions do not allow a double recovery to the heirs, as the survival action *compensates the decedent* for the injuries for which he could have recovered had he survived, whereas the wrongful death action compensates the heirs for such things as loss of support, companionship and comfort. See 22 Am. Jur. 2d, Damages §126; 3 Damages in Tort Actions §20.12 (1982). In most jurisdictions

recovery for pain and suffering is precluded where death is instantaneous or the victim is unconscious from the time the injury occurred until death. 3 Damages in Tort Actions §21.11 [1, 2]; 22 Am. Jur. 2d, Damages §128.

Under some statutory schemes the potential for double recovery by the heirs is limited. A number of state survival statutes specifically exclude recovery for the decedent's pain and suffering. See Ariz. Rev. Stat. Ann. §14-3110 (1975); Cal. Probate Code §573 (West 1983 Supp.); Colo. Rev. Stat. §13-20-101 (1973); Wash. Rev. Code §4.20.046 (1981). The reason for the exclusion is the belief that since *the decedent alone endured the pain and can no longer benefit from the award,* there is no reason for the survivors *to be enriched* as a result of the decedent's suffering. 3 Damages in Tort Actions §21.11[5] (1982). At least one other state has enacted a statute which requires one action to be brought to recover damages for the pain suffered by the decedent as well as the damages suffered by the heirs as a result of the death, to ensure that "there shall be only one recovery for the same injury." See Me. Rev. Stat. Ann. tit. 18-A, § 2-804(c) (1981).

The basic principle of damages is to make a party whole by putting that party back in the same position as it was prior to the injury, not by granting a windfall. *Service Iron Foundry, Inc. v. M. A. Bell Co.,* 2 Kan. App. 2d 662, 679, 588 P.2d 463 (1978). See also 25 C.J.S., Damages §3; *Koch v. Merchants Mutual Bonding Co.,* 211 Kan. 397, 401, 507 P.2d 189 (1973). In assessing damages, it is within the discretion of the trial court to apply equitable standards in order that the plaintiff may be made whole. *Seaman U.S.D. No. 345 v. Casson Constr. Co.,* 3 Kan. App. 2d 289, Syl. ¶ 2, 594 P.2d 241 (1979). Where the decedent suffers severe injuries which result in immediate or almost instantaneous death, it is absurd to maintain the decedent may be "made whole" when compensated for the pain and suffering which he experienced prior to death. The decedent can no longer benefit from an award of damages. Recovery for such damages by the heirs, under the guise of recovering on behalf of the decedent, results solely in a windfall to the heirs, as they are entitled to maintain an action in their own right for, among other things, "mental anguish, suffering, or bereavement; loss of society, companionship, comfort or protection," and loss of support under K.S.A. 60-1904. In other words, as here, the heirs are

"made whole" by being *fully compensated* for the damages they suffered in their wrongful death action.

Awards for damages in survival actions should be limited whenever possible. As stated in 25 C.J.S., Damages §3:

"As a general rule, a person who has sustained loss or injury may receive no more than just compensation for the loss or injury sustained. He is not entitled to be made more than whole, and he may not recover from all sources an amount in excess of the damages sustained, or be put in a better condition than he would have been had the wrong not been committed. . . .

. . . .

"It is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury. A plaintiff may not recover damages twice for the same injury simply because he has two legal theories . . . ." pp. 627-29.

In the instant case the heirs of the decedent rightfully recovered $360,000 for the decedent's future lost earnings and for their nonpecuniary losses resulting from the death. *They were therefore made whole in their cause of action.* The decedent's heirs should not be permitted to benefit from the pain and suffering experienced by the decedent in this case prior to his death, where the decedent himself could not be made whole by the recovery of those damages. The award of such damages merely results in a windfall or double recovery for the heirs of the decedent for an injury resulting in almost instantaneous death arising out of the appellant's single act of wrongdoing.

My conscience is shocked by a judgment in this case which permits the heirs to benefit by double recovery for a single act of wrongdoing. It is respectfully submitted that the damage award for $350,000 in the survival action should be set aside. Absent court action to control the administration of justice on the facts and circumstances presented by this case, it is suggested the legislature take immediate action to limit recovery.