No. 77,450

FLINT HILLS RURAL ELECTRIC COOPERATIVE ASSOCIATION, *Appellee,* v. FEDERATED RURAL ELECTRIC INSURANCE CORPORATION, *Appellant.*

(941 P.2d 374)

Opinion filed May 30, 1997.

*Paul Hasty, Jr.,* of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, argued the cause, and *Casey O. Housley,* of the same firm, was with him on the briefs for appellant.

*J. H. Eschmann,* of Ascough, Eschmann, Oyler, P.A., of Topeka, argued the cause, and *Keats A. Quinalty,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Flint Hills Rural Electric Cooperative (Flint Hills) claimed insurance coverage under a liability policy issued by Federated Rural Electric Insurance Corporation (Federated) for a punitive damage award entered against Flint Hills in a personal injury and wrongful death action. Federated denied coverage, arguing that notwithstanding K.S.A. 40-2,115, the public policy of Kansas precludes a corporation from obtaining insurance coverage for punitive damages assessed on the basis of the corporation's direct

liability for the underlying wrongful act. The district court held that (1) K.S.A. 40-2,115 permits a corporation to obtain coverage for punitive damages and (2) the punitive damages awarded were covered under the contract of insurance. Federated appealed. The case was transferred to this court pursuant to K.S.A. 20-3018(c).

In 1987, the Cerretti family was involved in an accident when their sailboat contacted an overhead electric line strung over Council Grove City Lake. Lynean Ann Cerretti was killed and Randall Cerretti was injured. The family filed a personal injury and wrongful death action against Flint Hills. See *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 837 P.2d 330 (1992). No action was brought against any employee of Flint Hills individually. Flint Hills was insured through liability and commercial umbrella policies with aggregate liability policy limits of $6,000,000 issued by Federated.

Federated tendered a defense for Flint Hills in the Cerretti lawsuit. The case proceeded to trial, and the Cerrettis were awarded $1,860,000 in actual and $75,000 in punitive damages. Flint Hills appealed, raising numerous issues including whether the award of punitive damages was proper. Flint Hills argued there was no clear and convincing evidence of wanton conduct on its part, as required by K.S.A. 1991 Supp. 60-3701(c), to support an award of punitive damages. It contended that a wanton omission or failure to act could not be the basis for a punitive damage award. Flint Hills asserted that because the original installation of its power line was neither negligent nor in violation of any safety standard, it created no substantial risk of injury. Flint Hills argued that subsequent events created by Coast Catamaran, the sailboat manufacturer, and its customers created the risk of injury. Flint Hills then stated that for punitive damages to be assessed against a corporate defendant, the wanton conduct had to be performed, expressly authorized, or ratified by a managerial employee of the corporation. 251 Kan. at 367. Flint Hills then argued: "[T]he only conduct suggested to meet this test is the failure of Gerald Ridenour [the general manager/CEO] to order relocation of the line after receiving a letter from Coast Catamaran." 251 Kan. at 367-68.

In rejecting Flint Hills' argument that a failure to act can never form the basis for an award of punitive damages, the *Cerretti* court noted the following facts found by the trial court when it denied Flint Hills' motion for directed verdict on the punitive damages issue:

"[The trial court] noted Flint Hills CEO Gerald Ridenour was informed in 1982 that there was a Flint Hills 7200-volt line over the west end of the Council Grove City Lake that could interfere with sailboats. The power line was dangerous. After receiving notice, there was no action by Ridenour or anyone under him who inquired as to the lines or the use of the lake by sailboats. When warned of the hazard, Ridenour failed to determine the height of the line over the lake. The defendant did not refer to the [National Electric Safety Code] to determine the required clearance under the existing conditions." 251 Kan. at 366.

In affirming the award of punitive damages, the *Cerretti* court observed that, based upon Kansas case law, wanton conduct may be found where the power company could be deemed to have realized the imminence of danger to another from its acts and to have refrained from taking steps to prevent injury because it was indifferent to whether the injury occurred or not. 251 Kan. at 368. The *Cerretti* court then stated:

"Here, the jury found there was clear and convincing evidence that Flint Hills' officer was authorized to act. It determined that Flint Hills' officer had wantonly failed to act when action was required, and the corporation should be punished so others would be deterred by the award of punitive damages. We find there is sufficient evidence to support the jury's verdict." 251 Kan. at 369.

Subsequently, Federated refused to reimburse Flint Hills for the punitive damages amount, claiming that punitive damages were excluded by the express terms of its policy and by the public policy of Kansas. Flint Hills filed a petition in the District Court of Lyon County seeking recovery for the $75,000 it had paid to the Cerrettis for the punitive damage award. The petition initially sought recovery under contract and tort theories, but Flint Hills withdrew the tort claims and proceeded solely on the breach of a contract theory. Both sides filed motions for summary judgment.

The district court framed the issues as (1) whether the terms of Federated's policy precludes the reimbursement for punitive damages by its terms and (2) whether Flint Hills was collaterally es-

topped from arguing the status of Gerald Ridenour. With respect to the issue of coverage under Federated's policy, the district court held that the policy, which obligated Federated to pay "all sums" assessed against Flint Hills due to personal injury, covered reimbursement for punitive damages. Federated also argued that K.S.A. 40-2,115 permits obtaining insurance coverage for punitive damages only in circumstances of vicarious liability. Federated asserted that since, in the underlying litigation, Flint Hills had been found to be directly liable on the basis of the wanton acts of their managerial employee, Ridenour, Flint Hills was collaterally estopped to reargue the basis for its liability in the second action. The district court rejected this argument, noting that the provisions of K.S.A. 40-2,115 essentially provide that the policy of this state permits insurance coverage against punitive damages when they arise as a result of the acts or omissions of the insured's employees, agents, or servants.

The district court granted Flint Hills' motion for summary judgment and awarded Flint Hills $75,000 plus interest accrued.

## STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When a summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment. *Patterson v. Brouhard*, 246 Kan. 700, 702, 792 P.2d 983 (1990).

" 'The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' " *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 445, 827 P.2d 24 (1992).

## DISCUSSION

Federated argues that Kansas case law and K.S.A. 40-2,115 prohibit a corporation from obtaining insurance coverage for punitive

damages for direct (not vicarious) liability. If Federated is correct, this court need not construe the applicable policy of insurance. To determine the issue, we are required to review decisions of this court and legislative enactments that occurred between 1980 and 1984.

### A. *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*

In 1980, this court decided *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 228 Kan. 532, 535, 618 P.2d 1195 (1980), *overruled on other grounds* 232 Kan. 76, 652 P.2d 665 (1982). The case arose out of *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 553 P.2d 254 (1976). Guarantee sued Interstate, its insurer, to recover amounts for punitive damages assessed against Guarantee in *Ford* because of its breach of duty to accurately examine the title records and expenses. Guarantee alleged that (1) the errors and omissions indorsement on Guarantee's liability insurance policy issued by Interstate covered punitive damages, and (2) Interstate was guilty of bad faith and negligence in the defense of Guarantee in *Ford*.

In *Ford*, Guarantee and its principal, Chicago Title Insurance Co., were found liable for the negligent and reckless acts of Carl Zimmerman, vice-president of Guarantee, for failing to obtain a deed in exchange for the payment of the purchase price and for failing to issue a title policy or return the purchase price as demanded by the Fords. The jury returned a verdict of $8,687.65 in compensatory damages against Guarantee and Chicago Title and punitive damages of $35,000 against Guarantee and $70,000 against Chicago Title. On appeal, the court affirmed the award of compensatory damages and reduced the punitive damages by one half.

Subsequently, Guarantee filed an action alleging that Interstate was liable for all actual and punitive damages assessed against Guarantee and Chicago Title under the terms of the insurance policy. The trial court found punitive damages had been awarded against Guarantee and Chicago Title in *Ford* based upon Zimmerman's reckless conduct and reasoned that conduct was covered

under the policy. The trial court also found Zimmerman's actions were not committed maliciously, nor had the corporation ratified his acts. The trial court stated a finding of malice or evidence of corporate ratification of Zimmerman's actions were the sole exceptions that would exclude coverage under the policy. Interstate appealed.

At the outset, the *Guarantee* court noted the case was not solely one of vicarious liability, so that the rule allowing insurance coverage for punitive damages in such cases was not applicable. 228 Kan. at 535. The court, citing *Koch v. Merchants Mutual Bonding Co.*, 211 Kan. 397, 507 P.2d 189 (1973), then stated:

"Nevertheless, we reject such a rule, regardless of whether liability is incurred vicariously or directly. It is against the public policy of this state to allow a wrongdoer to purchase insurance to cover punitive damages [citation omitted], and we interpret that rule to include any person who has incurred such liability regardless of whether the liability resulted from the insured's own acts or those of his employee, servant or agent." 228 Kan. at 535.

## B. K.S.A. 40-2,115

Three years after our decision in *Guarantee*, H.B. 2062 was introduced in the 1983 session of the Kansas Legislature in the House of Representatives, sponsored by Representative Robert Vancrum. The bill provided that it was not against the public policy of Kansas for a person or entity to obtain insurance covering liability for punitive damages assessed as a result of vicarious liability, without the actual prior knowledge of the insured. On February 24, 1983, Rep. Vancrum testified before the House Committee on Insurance in favor of the bill. The bill was reported favorably by the House Committee on Insurance but was withdrawn from the 1983 calendar and referred back to the House Committee on Insurance. Minutes of House Committee on Insurance, February 24, 1983.

## C. *Kline v. Multi-Media Cablevision, Inc.*

After H.B. 2062 had been introduced in the 1983 legislative session, but before it was enacted in the 1984 legislative session, this court decided *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 666 P.2d 711 (1983). *Kline* involved a certified question from

the United States District Court for the District of Kansas. The question was certified because there was no controlling precedent in the decisions of the Supreme Court and the Court of Appeals. K.S.A. 60-3201.

The certified facts of *Kline* are: In 1980, employees of Multi-Media Cablevision removed a manhole cover in the course of their employment. Kline rode by the work site on his bicycle, hit the open manhole, and was seriously injured. Kline filed suit in the McPherson County District Court against Multi-Media but not against the employees individually. Kline's petition alleged in part that " 'the failure to replace the cover on the open manhole, failure to warn that the cover was removed and failure to erect a barricade or barrier or to otherwise use safety devices around the open manhole' " supported a claim for compensatory and punitive damages. 233 Kan. at 989.

Multi-Media removed the case to federal district court and filed a motion for summary judgment on the punitive damage issue. The federal district judge, Judge Kelly, certified the following question to this court:

" 'Under Kansas law, may a corporation be held liable for punitive damages arising from an act of an agent or employee, within the scope of the agent's or employee's employment, when the corporation, through its board of directors or an officer, has neither directed, authorized nor ratified the act?' " 233 Kan. at 989.

In answering the question, the *Kline* court first noted the general rules that a corporation is liable for the torts of its agent when committed within the scope of the agent's authority and course of employment even though it did not authorize or ratify the tortious acts. The court, citing *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 63, 643 P.2d 100 (1982), and *Newton v. Hornblower, Inc.*, 224 Kan. 506, 525, 582 P.2d 1136 (1978), then observed that (1) punitive damages are appropriate when the elements of fraud, malice, gross negligence or oppression accompany the wrongful act; (2) such damages are awarded to punish the wrongdoer for his malicious, vindictive, willful, or wanton invasion of the injured person's rights; and (3) they also serve as an example to restrain and

deter others from the commission of such wrongs. 233 Kan. at 989-90.

The *Kline* court observed there were two possible answers to the question of when a corporation may be held liable for punitive damages for the wrongful acts of its employees committed within the course of their employment. First, a corporation could be held liable for punitive damages whenever the employee was acting within the scope of employment. The *Kline* court noted this was the "vicarious liability" rule and was followed by a majority of the courts. The "vicarious liability" rule focused on the deterrence aspect of punitive damages. The theory was such a rule would encourage employers to exercise closer control over their employees and thereby reduce the probability of the occurrence of torts which would support a punitive damages award. 233 Kan. at 990.

The *Kline* court explained that the second possible answer to the question—and the minority rule—was that a corporation might be held liable for punitive damages resulting from acts of its employees only when it has directed or ratified those acts. As authority, the court cited the Restatement (Second) of Torts § 909 (1977):

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

(a) the principal or a managerial agent authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act."

The *Kline* court noted this was called the "complicity" rule and focused on the first reason for the award of punitive damages—punishment of the wrongdoer. The rule recognized that ordinarily it is improper to impose the burden of punitive damages on one who is innocent of wrongdoing. 233 Kan. at 991. In adopting this rule, the *Kline* court explained that the "complicity" rule furthers the deterrence theory by putting the corporation on notice that if (1) a managerial agent authorizes, approves or ratifies the act, (2)

the act is performed by a managerial employee acting within the scope of employment, or (3) the corporation or a managerial employee was reckless in employing or retaining the acting employee, the corporation may be liable for punitive damages, causing a corporation to exercise stricter control over its employees. 233 Kan. at 992-93. The court stated the real advantage of the complicity rule is that it provides for a determination of whether the corporation is actually blameworthy before awarding damages. The *Kline* court rejected a more restrictive rule which would have focused only upon whether corporate officers and directors authorized, ratified, or directed the employee's wrongful conduct. It preferred the greater flexibility of the Restatement rule, which "allows the factfinder to consider the actions of the corporation or its managerial agents peculiar to the case." 233 Kan. at 993.

The *Kline* court concluded that the answer to the certified question was: A corporation is not liable for punitive damages for an employee's tortious acts committed within the scope of his employment unless (a) the corporation or its managerial agent authorized the doing and manner of the act; (b) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him; (c) the employee was employed in a managerial capacity and was acting in the scope of employment; or (d) the corporation or its managerial agent ratified or approved the act of the employee.

Although the *Kline* decision limited a corporation's liability to situations where the corporation is found to be directly rather than vicariously liable, the decision did not change the public policy against insurance for punitive damages rule of *Guarantee Abstract*, 228 Kan. 532.

*Kline* was followed by the court in *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653 (1984) (upholding award of punitive damages against corporation where corporate employer was liable for negligent hiring and also directed and ratified acts of employee), and *Smith v. United Technologies*, 240 Kan. 562, 731 P.2d 871 (1987) (upholding punitive damages award against corporation based upon acts by managerial personnel in the scope of their employment). For a subsequent statutory modification of

*Kline,* see K.S.A. 60-3701(d)(1) (no punitive damages can be assessed against a principal or employer for acts of an agent or employee "unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer"); *Smith v. Printup,* 254 Kan. 315, 336-37, 866 P.2d 985 (1993).

Here the jury found that Flint Hills' officer had wantonly failed to act when required. A corporation is liable for punitive damages for the tortious acts of a managerial agent acting within the scope of his or her employment.

### D. K.S.A. 40-2,115 Enacted

H.B. 2062 was reintroduced in the 1984 legislative session as H.B. 2876. In his statement to the House Committee on Insurance, Rep. Vancrum stated:

"The bill would merely reverse the 1980 Supreme Court ruling in the Guarantee Abstract Case, in which the Supreme Court of Kansas stated that the public policy of Kansas does not permit an insurance company to reimburse an employer for punitive damages assessed against the employer due to the intentional acts of his employees or agents, even if he had no prior knowledge of the acts and had no way to prevent same. . . .

"Let me give you a brief example of instances in which this provision comes into play. Suppose a trucking company employs a driver for several years who then by his negligence causes an accident which causes serious injuries to the motorist. If a jury finds negligence, both he and the company are obligated to pay damages. The company of course did not authorize him to drive negligently, but they can at least obtain insurance to cover this liability. However, if the jury is sufficiently impressed that the driver's actions were in reckless disregard of the law or rights of other motorists or if they find that he intentionally assaulted another individual, a jury might be permitted to award not only actual but punitive damages intended to 'punish' the wrongdoer against the trucking company. In such a case, the trucking company still did not authorize the actions and in fact may not have even been aware of them but in such a situation the Kansas Supreme Court ruling states that we are not going to permit insurance companies to reimburse the company, even if they have written an insurance policy which claims to cover punitive damages.

"The overwhelming majority of states permit the reimbursement of punitive damages to the innocent employer." Minutes of House Committee on Insurance, February 24, 1984.

In his statement supporting the bill, Todd Sherlock of the Kansas Association of Realtors made the following statement:

"The bill will allow for the employer to obtain insurance in the event that he is held liable for punitive damages assessed against him because of the intentional or reckless conduct of his employees, without the prior knowledge of the employer. Without such insurance protection, the employer is left wide open to acts done without his knowledge by his agent." Minutes of House Committee on Insurance, February 24, 1984.

On March 30, 1994, HB 2876 was discussed in the Senate Judiciary Committee. Rep. Vancrum made a statement similar to that made before the House Committee. His statement was entitled "On HB 2876—The Vicarious Liability for Punitive Damages Bill." Testifying in support of the bill on behalf of the Kansas Bar Association, John Brookens stated:

"It is public policy, and we think properly so, that one who commits an act for which punitive damages may be recovered should not be permitted to insure against pay-out of punitive damages.

"But if the employer had no knowledge of and did not acquiesce in the employee's act which was malicious, willful, intentional, or in reckless disregard of the rights of others—the employer may still, under the doctrine of respondeat superior become vicariously liable in punitive damages for the act of the employee. We see no logic in law or reason why the employer, under these circumstances, should not be able to protect himself against this type of punitive damages. The employer is not the actual wrong-doer, he did not have knowledge of the wrong, he did not acquiesce in the wrong." Minutes of Senate Judiciary Committee, March 30, 1984.

H.B. 2876 was reported out of committee and passed by the legislature, and K.S.A. 40-2,115 became effective on April 26, 1984.

K.S.A. 40-2,115(a) provides:

"It is not against the public policy of this State for a person or entity to obtain insurance covering liability for punitive or exemplary damages assessed against such insured as the result of acts or omissions, intentional or otherwise, of such insured's employees, agents or servants, or of any other person or entity for whose acts such insured shall be vicariously liable, without the actual prior knowledge of the insured."

A review of the legislative history of the enactment of K.S.A. 40-2,115 clearly indicates that the statute was enacted as a limited exception to the public policy of *Guarantee Abstract* prohibiting insurance coverage for punitive damages.

## E. Conclusion

In 1980, the Kansas public policy set out in *Guarantee Abstract* prohibited Flint Hills from purchasing insurance to cover liability for punitive damages in all cases. *Kline*, decided in 1983, did not alter the public policy of *Guarantee Abstract*, but held that punitive damages can only be assessed against a corporation if the corporation is directly liable. K.S.A. 40-2,115 is considered in our analysis only because the trial court applied that statute in determining there was coverage in the insurance contract for payment of punitive damages assessed against the insured. Since the claim against Flint Hills did not involve vicarious liability of a corporation, neither K.S.A. 40-2,115 nor the later enacted K.S.A. 60-3701(d) applies.

The accident in this case occurred on August 22, 1987. At trial, the jury determined that Flint Hills was directly liable, not vicariously liable, for the wrongful death and injury to the Cerretti family. The wanton act in *Cerretti* for which punitive damages was awarded to punish Flint Hills was the failure of its managerial employee, Ridenour, to order relocation of the electric line after receiving a letter warning that the line was dangerous. Insurance policies can be enforced as written so long as the terms do not conflict with pertinent statutes or public policy. *House v. American Fam. Mut. Ins. Co.*, 251 Kan. 419, Syl. ¶ 3, 837 P.2d 391 (1992). Since the public policy of the state prohibits insurance coverage for any entity found directly liable for punitive damages, even if the insurance policy Flint Hills purchased from Federated purported to provide insurance coverage for Flint Hills, such coverage if included in the policywould be void as against Kansas public policy.

The decision of the district court is reversed.