No. 74,656

THE HARTFORD ACCIDENT & INDEMNITY COMPANY, *Appellant/ Cross-appellee*, v. AMERICAN RED BALL TRANSIT COMPANY, INC., and ALBERT PRINTUP, *Appellees*, and BARRY L. SMITH, Administrator of the Estate of Glen C. Smith, deceased, *et al.*, *Appellees/Cross-appellants.*

(938 P.2d 1281)

Opinion filed June 6, 1997.

*Philip L. Bowman*, of Adams, Jones, Robinson & Malone, Chartered, of Wichita, argued the cause, and *Donald W. Bostwick*, and *Clifford L. Malone*, of the same firm, were with him on the briefs for appellant/cross-appellee Hartford Accident & Indemnity Company.

*Randall E. Fisher*, of Wichita, argued the cause and was on the brief for appellees/cross-appellants Smith *et al.*

*Terrill D. Albright*, of Baker & Daniels, of Indianapolis, Indiana, argued the cause, and *Ronald D. Gifford*, of the same firm, and *James L. Grimes, Jr.*, and *Jay F. Fowler*, of Foulston & Siefkin, of Topeka. were with him on the briefs for appellee American Red Ball Transit Company, Inc.

The opinion of the court was delivered by

DAVIS, J.: Hartford Accident & Indemnity Company (Hartford), the insurer of American Red Ball Transit Company, Inc., (Red Ball) filed a declaratory judgment action requesting a determination that it was not obligated to indemnify Red Ball or Albert Printup for punitive damages. The district court held that Hartford was obligated to indemnify Red Ball, but not Printup. Hartford appeals from the court's decision with regard to Red Ball, and Barry L. Smith, administrator of the estate of Glen C. Smith, deceased, cross-appeals from the decision with regard to Printup.

We are called upon to answer the questions of whether Kansas law applies in this case; whether federal law preempts Kansas law; and, if not, whether under the facts of this case there is a Kansas policy against insuring for punitive damages. While the parties raise and discuss additional issues, a resolution of the above three issues will resolve this case.

We conclude that Kansas law applies and is not preempted by federal law. We further conclude that under the facts of this case, a state policy against insurance coverage for punitive damages exists. We, therefore, reverse the judgment that Hartford is liable under its policy for punitive damages awarded against Red Ball. In all other respects, we affirm.

## FACTS

The underlying facts of the present case are set forth in *Smith v. Printup*, 254 Kan. 315, 866 P.2d 985 (1993) (*Smith v. Printup I*). That same case was also the subject of a second appeal, *Smith v. Printup*, 262 Kan. 587, 938 P.2d 1261 (1997) (*Smith v. Printup II*). Highly summarized, Albert Printup jackknifed his moving van and collided with a pickup truck, illing both occupants of the truck. Carolyn S. Elliott died immediately, while Glen C. Smith survived for some minutes before dying at the scene.

Printup was employed by Southwest Movers, Inc., (Southwest) but had been "leased out" to Red Ball for 4 to 5 years preceding the accident. The relatives of Elliott and Smith sued Printup, Southwest, and Red Ball for wrongful death, and the administrator of the Smith estate sued the same defendants for Smith's pain and suffering. The trial court allowed the Smith plaintiffs (Smith) to amend their complaint to seek punitive damages in accordance with K.S.A. 60-3701 against Southwest, Printup, and Red Ball in conjunction with the survivor action.

In addition to awarding compensatory damages in both wrongful deaths, the jury determined that Smith was entitled to punitive damages from Red Ball and Printup but not from Southwest in Smith's survival action. The focus of *Smith v. Printup I* related to punitive damages. We set aside the amount of punitive damages awarded against Red Ball and Printup, reversed the jury determination that Smith should not be awarded punitive damages against Southwest, and remanded with specific instructions. 254 Kan. at 359-60. Upon completion of the remand proceedings, the trial court set the punitive damage award against Red Ball at $100,000 and against Printup at $20,800. A jury again determined that Southwest was not liable for any punitive damages. In *Smith v. Printup II*, we affirmed both the trial court's and the jury's determinations. Southwest is not a party to this appeal. While Printup does not respond to this appeal, the coverage issues concerning punitive damages against Red Ball and Printup remain.

The policy issued by Hartford was in effect at the time of the accident and contained the necessary Interstate Commerce Commission (ICC) form BMC 90 endorsements. Both Red Ball and Printup were "insureds" under the terms of the policy. Based upon undisputed facts, the trial court determined that Hartford's policy covered the punitive damage award against Red Ball but not the punitive damage award against Printup. While the court decided other matters, the appeals in this case involve only the question of insurance coverage for punitive damage awards against Red Ball and Printup. Additional facts necessary to resolve insurance coverage of punitive damages are set forth in the opinion.

## STANDARD OF REVIEW

The parties do not dispute the facts. The only questions before this court involve questions of law over which this court's review is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

## CHOICE OF LAW

Red Ball contends that Indiana law applies because it is the state where the insurance policy was issued. See *Simms v. Metropolitan Life Ins. Co.*, 9 Kan. App. 2d 640, 685 P.2d 321 (1984). The trial court, relying upon *Norfolk & W. Ry. Co. v. Hartford Acc. & Indem. Co.*, 420 F. Supp. 92, 94 (N.D. Ind. 1976), determined that Indiana law required the issue of punitive damages to be determined under the law of the state with the most "intimate contact" with the transaction. Thus, the trial court held that "[t]he meritorious position of Red Ball [application of the law where the contract was entered into applies] sends us to Indiana and, under Indiana law, back to Kansas for its interpretation of the issues."

We agree that Kansas law applies but not for the reasons set forth by the trial court. The application of Kansas law is controlled by *St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc.*, 245 Kan. 258, 777 P.2d 1259 (1989), *cert. denied* 493 U.S. 1036 (1990). In *St. Paul*, the losing defendants in a successful products liability case appealed the trial court's decision that Kansas public policy precluded their recovery of assessed punitive damages from their liability insurers. The defendants argued that the trial court erred in applying Kansas law to deny insurance coverage of the punitive damages, relying on the *lex loci* rule in *Simms*, 9 Kan. App. 2d 640. We acknowledged *Simms* but noted that there is an exception to the *lex loci* rule where the contract contravenes the settled public policy of the state whose tribunal is invoked to enforce the contract. 245 Kan. at 269-70. Applying Kansas law and Kansas public policy, we said:

"If we were to refuse to apply Kansas law on the issue of punitive damages, we would thwart the purposes for which the policy was adopted.

'Where exemplary damages are awarded for purposes of punishment and deterrence, as is true in this state, public policy should require that payment

rest ultimately as well as nominally on the party who committed the wrong; otherwise they would often serve no useful purpose. The objective to be attained in imposing punitive damages is to make the culprit feel the pecuniary punch, not his guiltless guarantor.' *Koch v. Merchants Mutual Bonding Co.*, 211 Kan. [397, 405, 507 P.2d 189 (1973)].

"The objective of the policy is to prevent wrongful acts against the citizens of the State of Kansas. . . .

. . . .

"A finding that Kansas public policy does not apply to the punitive damages in the *O'Gilvie* action would effectively excuse [the corporate defendant] from the consequences of its reckless behavior with this state. Failure to apply Kansas law would establish an undesirable precedent for other tort and product liability actions. In any product liability action which involves an out-of-state manufacturer, the manufacturer could avoid the application of Kansas public policy where the manufacturer had contracted outside the State of Kansas for insurance of punitive damages. This would result in the uneven application of the public policy. Kansas tortfeasors would be required to feel the 'pecuniary punch' while out-of-state tortfeasors could require their 'guiltless' insurance companies to pay such damages. Out-of-state tortfeasors who contracted with out-of-state carriers would, therefore, not be subject to deterrence for committing reckless acts in Kansas." 245 Kan. at 272-73.

In *St. Paul*, the injured party was a Kansas resident fatally injured by a defective product that was used in Kansas. Here, two Kansas residents were fatally injured in an accident that occurred in Kansas. The argument that application of Indiana law is necessary to maintain a uniform interpretation of the insurance policy Red Ball contracted with Hartford finds support in the traditional notions underlying the *lex loci* rule. However, the interest of Kansas exceeds Indiana's interest in the resolution of the instant controversy. See 245 Kan. at 270.

## FEDERAL PREEMPTION

Generally, federal preemption of state law occurs only if state law conflicts with or frustrates the federal scheme or Congress sought to occupy the field to the exclusion of the states. There is a reluctance to infer preemption, and there is an assumption that Congress did not intend to displace state law. *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 122 L. Ed. 2d 565, 113 S. Ct. 1190 (1993).

The parties do not suggest that Congress has expressly preempted this field. Neither do the parties argue that Congress has sought to occupy the field to the exclusion of the states. Instead, Smith argues that state law conflicts with the federal law and, thus, the preemption doctrine applies.

We have recently reviewed the federal preemption doctrine in *Jenkins v. Amchem Products, Inc.*, 256 Kan. 602, 607-08, 886 P.2d 869 (1994), *cert. denied* 133 L. Ed. 2d 38 (1995). *Jenkins* affirms the general rule regarding preemption:

> "The doctrine of federal preemption is founded on the Supremacy Clause, U.S. Const. art. VI, cl. 2:
>
>> 'This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'
>
> Thus, any 'state law that conflicts with federal law is "without effect." ' *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 120 L. Ed. 2d 407, 422, 112 S. Ct. 2608 (1992). The preemption analysis presumes that police powers historically left to the states are not superseded by federal law. [Citations omitted.] The presumption against federal preemption of state law may be overcome if Congress intended preemption. [Citations omitted.] Preemption may be express or implied:
>
>> 'Congress' intent may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." [Citation omitted.] In the absence of an express congressional command, state law is pre-empted' if that law actually conflicts with federal law [citation omitted], or if federal law so thoroughly occupies a legislative field " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " [Citations omitted.]' *Cipollone*, 420 L. Ed. 2d at 422-23."

In *Elkins v. Showcase, Inc.*, 237 Kan. 720, 704 P.2d 977 (1985), we discussed the meaning of conflict between federal and state law in regards to preemption. We said that the conflict between the two laws must be positive and direct in order to make coexistence of the two laws an impossibility. It is necessary that the state law in its application to the same field contravene federal public policy or cause a different result or consequence. 237 Kan. at 727; see *Watkins v. H.O. Croley Granary*, 555 F. Supp. 458, 460 (N.D. Ga. 1982).

In *Goben v. Barry*, 237 Kan. 822, Syl. ¶ 3, 703 P.2d 1378 (1985), we said: "In making a determination of federal preemption, a court

should examine those concerns emphasized by Congress in enacting the legislation. State law should be preempted only to the extent necessary to protect achievement of the purposes of the federal act in question."

The federal Motor Carrier Safety Act, 49 U.S.C. § 10927 (1994), provides in relevant part:

"(a)(1) The [Interstate Commerce] Commission [ICC] may issue a certificate under section 10922 or 10530 or a permit under section 10923 only if the carrier . . . applying for such certificate files with the Commission a bond, insurance policy, or other type of security approved by the Commission, in an amount not less than such amount as the Secretary of Transportation prescribes . . . . The security must be sufficient to pay, not more than the amount of the security, for each final judgment against the carrier for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles under the certificate or permit, or for loss or damage to property . . . or both."

Pursuant to this statutory authority, the ICC promulgated regulations in 49 C.F.R. § 1043 (1995), relating to insurance coverage, and 49 C.F.R. § 1057 (1995), regarding the lease and interchange of vehicles among motor carriers. Section 1043 requires that all interstate motor carriers obtain a certificate with the ICC. The regulations specify that

"no certificate or permit shall be issued to such a carrier or remain in force unless and until there shall have been filed with and accepted by the Commission surety bonds, certificates of insurance, proof of qualifications as self-insurer, or other securities or agreements, in the amounts prescribed in § 1043.2, conditioned to pay any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles in transportation subject to subchapter II, chapter 105, subtitle IV of title 49 of the U.S. Code, or for loss of or damage to property of others . . . ." 49 C.F.R. § 1043.1(a)(1). (Emphasis added.)

The ICC regulations provide for minimum dollar amounts of coverage. 49 C.F.R. § 1043.2. In addition, "[e]ach policy of insurance in connection with the certificate of insurance which is filed with the Commission, shall be amended by attachment of the appropriate endorsement prescribed by the Commission or the Department of Transportation and the certificate of insurance filed must accurately reflect that endorsement." 49 C.F.R. § 1043.6(c).

The same minimum insurance coverage is required from a carrier who leases vehicles from another interstate carrier. 49 C.F.R. § 1057.12(j)(1) (1995).

There is a clear consensus among jurisdictions regarding the policy underlying 49 U.S.C. § 10927. One court stated the purpose as follows: "The purpose of ICC statutory law and regulations is to ensure that a financially responsible party will be available to compensate third persons injured in a collision with an ICC carrier." *Maryland Cas. Co. v. City Delivery Service, Inc.*, 817 F. Supp. 525, 530 (M.D. Pa. 1993).

The United States Supreme Court discussed the policy behind the financial responsibility statute and rules promulgated by the ICC thereunder:

"It is apparent . . . that sound transportation services and the elimination of the problem of a transfer of operating authority, with its attendant difficulties of enforcing safety requirements and of fixing financial responsibility for damage and injuries to shippers and members of the public, were the significant aims and guideposts in the development of the comprehensive rules." *Transamerican Freight v. Brada Miller*, 423 U.S. 28, 37, 46 L. Ed. 2d 169, 96 S. Ct. 229 (1975).

See *Carolina Cas. Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 312 (5th Cir. 1978); *Carolina Cas. Ins. Co. v. Transport Indem. Co.*, 533 F. Supp. 22 (D.S.C. 1981), *aff'd* 676 F.2d 690 (4th Cir.), *cert. denied* 459 U.S. 829 (1982). See also *Canal Ins. Co. v. First General Ins. Co.*, 889 F.2d 604, 610 (5th Cir. 1990) ("[T]he ICC is empowered to promulgate regulations to insure that motor carriers operating tractors or trailers as lessees under leasing arrangements . . . assume total responsibility for the operation of their rented vehicles, including obtaining adequate insurance."). With one exception, the parties do not cite to any case that suggests a different legislative purpose. That exception, *Alford v. Major*, 470 F.2d 132, 135 (7th Cir. 1972), addressed the broader policy underlying the passage of the entire Federal Motor Carrier Safety Act requiring the maintenance of leased equipment and the supervision of borrowed drivers.

A majority of jurisdictions have held that there is a limit to the extent of this federal policy and that 49 U.S.C § 10927 does not preempt all state law or regulations relating to insurance coverage

of interstate motor carriers. For example, the Seventh Circuit Court of Appeals, in discussing the doctrine of federal preemption with regard to the question of which carrier provided primary coverage, said:

"The purpose of the federal statute and regulations is to ensure that an ICC carrier has independent financial responsibility to pay for losses sustained by the general public arising out of its trucking operations. However, once it is clear that there are sufficient funds available to safeguard the public, the inquiry changes; '[t]he pertinent question is whether the federal policy of assuring compensation for loss to the public prevents courts from examining the manner in which private agreements *or state laws* would otherwise allocate the ultimate financial burden of the injury.' [*Carolina Cas. Ins. Co. v.*] *Insurance Co. of North America,* 595 F.2d [128,] 138 [(3d Cir. 1979)] (emphasis added). We agree with the majority view that 'I.C.C. public policy factors are frequently determinative where protection of a member of the public is at stake, but those factors cannot be invoked by another insurance company which contracted to insure a specific risk and which needs no equivalent protection.' [*Carolina Cas. Ins. Co. v.*] *Underwriters [Ins. Co,]* 569 F.2d [302,] 313 [(1978)]. Thus, we hold that ICC policy does not alter the application of the Indiana statute, which places primary coverage on [the defendants]. We would emphasize, however, that were it not for the Indiana statute, the policy provisions as to coverage would be controlling." *Travelers Ins. Co. v. Transport Ins. Co.,* 787 F.2d 1133 (7th Cir. 1986).

*American Surety Company of New York v. Gold,* 375 F.2d 523 (10th Cir. 1966), provides some help in analyzing the preemption question. In that case, the insurance company acknowledged its responsibility for compensatory damages assessed against its insured but denied any liability for punitive damages. The court acknowledged Kansas' policy against insurance for punitive damages. The court rejected the argument that a Kansas public policy against insurance for punitive damages was superseded by the Kansas Motor Vehicle Safety Responsibility Act. 375 F.2d at 527-28.

The *Gold* court stated that the legislative purpose of acts like the Kansas Motor Vehicle Safety Responsibility Act is " 'to provide compensation for innocent persons that might be injured through faulty operation of motor vehicles.' " 375 F.2d at 527. Here, the purpose of the federal act, not unlike the Kansas Motor Vehicle Safety Responsibility Act, is to require adequate security or insurance from those operating under an ICC certificate in order that members of the public will be fairly compensated for losses oc-

curring by reason of the negligent operation of ICC vehicles traveling throughout the country. The key under both the state and federal law is compensation.

The federal Motor Carrier Safety Act uses language which relates to security for compensating injured persons by reason of negligent operation:

*"The security must be sufficient to pay*, not more than the amount of the security, *for each final judgment against the carrier for bodily injury to, or death of, an individual* resulting from the negligent operation, maintenance, or use of motor vehicles under the certificate or permit, or for loss or damage to property . . . or both." (Emphasis added.) 49 U.S.C. § 10927.

The purpose of the Act is to ensure that financial security will be available to compensate injured parties. *Maryland Cas. Co.*, 817 F. Supp. at 530.

The federal Motor Carrier Safety Act contains no language which expressly includes or excludes punitive damages. We understand the argument of Smith to be that the language in the Act "each final judgment" directly conflicts with Kansas law because such language requires coverage of punitive damages. Thus, we inquire whether Congress has provided any information concerning its intent with regard to punitive damage coverage.

The predecessor of 49 U.S.C. § 10927 is § 215 of the federal Motor Carrier Act, 1935. Act of Aug. 9, 1935, ch. 498, § 215, 49 Stat. 557 (1935). The first sentence of this section stated:

"No certificate or permit shall be issued to a motor carrier or remain in force, unless such carrier complies with such reasonable rules and regulations as the Commission shall prescribe governing the filing and approval of surety bonds, policies of insurance, qualifications as a self-insurer or other securities or agreements, in such reasonable amount as the Commission may require, conditioned to pay, within the amount of such surety bonds, policies of insurance, qualifications as a self-insurer or other securities or agreements, *any final judgment* recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles under such certificate or permit, or for loss or damage to property of others." (Emphasis added.)

Neither the parties nor our independent research has located specific guidance on the question of whether Congress intended to include punitive damages. The Congressional Record of 1935,

which details the events occurring on the floors of the U.S. House and Senate, is silent with regard to the language in question. In addition, the contemporary legislative compilation, Wagner, A Legislative History of the Motor Carrier Act, 1935 (1935), in its discussion on pages 67-68 of relevant statements of legislators on certain words and phrases, does not provide any insight on whether Congress intended to include punitive damages or even whether Congress considered the issue of punitive damages. Moreover, the Hawkins Index-Digest-Analysis of Decisions under the Interstate Commerce Act does not report any agency decisions on the issue of insurance of punitive damages under the federal Motor Carrier Act.

Although Congress has made changes in the above language and related sections of the Act, it consistently has stated that no substantive change in the law was intended. See, *e.g.*, H.R. Rep. No. 95-1395 (1978), reprinted in 1978 U.S. Code Cong. & Ad. News 3009, 3013 ("The purpose of the bill is to restate in comprehensive form, without substantive change, the Interstate Commerce Act and related laws . . . . In the restatement, simple language has been substituted for awkward and obsolete terms, and superseded, executed, and obsolete statutes have been eliminated.").

Legislative history notes following 49 U.S.C. § 10927 explain that for clarity, the word "each" replaced "any."

Lacking any express evidence of congressional intent, we return to the basic policy concerns emphasized by Congress in passing § 10927 of the federal Motor Carrier Safety Act. See *Goben v. Barry*, 237 Kan. 822, Syl. ¶ 3. As previously stated, the purpose was "to ensure that a financially responsible party will be available to compensate third persons injured in a collision with an ICC carrier." *Maryland Cas. Co.*, 817 F. Supp. at 530.

Ensuring that a financially responsible party is available when a member of the public is injured by an interstate motor carrier does not conflict with the application of Kansas' public policy concerning insurance coverage for punitive damages. Federal law requires that adequate security or insurance coverage be available for any compensatory damages suffered by the public. Punitive damages are in effect a windfall to an injured plaintiff and are intended to punish

a wrongdoer rather than protect the injured party. We conclude that the doctrine of federal preemption does not prevent the application of Kansas law and policy on the issue of insurance coverage for punitive damages.

## INSURANCE COVERAGE FOR PUNITIVE DAMAGES

As discussed above, the public policy against the insurability of punitive damages by a wrongdoer was first expressed in *Koch v. Merchants Mutual Bonding Co.*, 211 Kan. 397, 507 P.2d 189 (1973). The policy was extended in *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 228 Kan. 532, 618 P.2d 1195 (1980). In that case, an employer argued that the policy did not apply in cases where an employer was assessed punitive damages vicariously. The court stated:

"[W]e reject such a rule, regardless of whether liability is incurred vicariously or directly. It is against the public policy of this state to allow a wrongdoer to purchase insurance to cover punitive damages [citation omitted], and we interpret that rule to include any person who has incurred such liability regardless of whether the liability resulted from the insured's own acts or those of his employee, servant or agent." 228 Kan. at 535.

After *Guarantee* was decided, a bill involving insurance coverage for punitive damages was introduced in the Kansas House in 1983. The bill was enacted during the following legislative session and became K.S.A. 40-2,115. The legislative history of K.S.A. 40-2,115 demonstrates that it was enacted in reaction to our decision in *Guarantee*. K.S.A. 40-2,115(a) provides:

"It is not against the public policy of this state for a person or entity to obtain insurance covering liability for punitive or exemplary damages assessed against such insured as the result of acts or omissions, intentional or otherwise, of such insured's employees, agents or servants, or of any other person or entity for whose acts such insured shall be vicariously liable, without the actual prior knowledge of such insured."

This statute was introduced prior to our decision in *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 666 P.2d 711 (1983), but did not pass until after *Kline* was decided. The time line involved in the enactment of K.S.A. 40-2,115 is as follows:

2-24-83 Representative Vancrum testified regarding H.B. 2062 (a version of what was to become K.S.A. 40-2,115) that the bill was intended to very simply reverse the ruling in the *Guarantee Abstract* case.

7-15-83 Opinion in *Kline v. Multi-Media Cablevision, Inc.*, 233 Kan. 988, 666 P.2d 711 (1983), announced.

2-24-84 Representative Vancrum again testified regarding H.B. 2876 (a version of what was to become K.S.A. 40-2,115): "The bill would merely reverse the 1980 Supreme Court ruling in the *Guarantee Abstract* case."

4-26-84 Effective date of K.S.A. 40-2,115.

The legislative history involving K.S.A. 40-2,115 does not mention or make reference to our decision in *Kline.*

*Kline* involved the following certified question from the United States District Court for the District of Kansas:

" 'Under Kansas law, may a corporation be held liable for punitive damages arising from an act of an agent or employee, within the scope of the agent's or employee's employment, when the corporation, through its board of directors or an officer, has neither directed, authorized nor ratified the act.' " 233 Kan. at 989.

The plaintiff in *Kline* urged this court to adopt a "vicarious liability" rule that a corporation be held liable for punitive damages whenever the employee, acting within the scope of employment, is liable. We considered the deterrence aspect of this rule and recognized that the vicarious liability rule was "followed by a majority of the courts." 233 Kan. at 990.

As a second possible answer to the certified question, we recognized what has been referred to as the "complicity rule" expressed in Restatement (Second) of Torts § 909 (1977). This rule basically provides that "a corporation might be held liable for punitive damages resulting from acts of its employees only when it has directed or ratified those acts." 233 Kan. at 990.

After a thorough discussion of the merits of each rule, we held:

"We hereby adopt the complicity rule set out in the Restatement (Second) of Torts § 909 (1977). Although couched in terms of master's and principal's liability for punitive damages arising out of acts of servants and agents, the rules are equally applicable to corporations.

"Thus we answer the certified question. A corporation is not liable for punitive damages for an employee's tortious acts committed within the scope of his employment unless (a) the corporation or its managerial agent authorized the doing and manner of the act; (b) the employee was unfit and the corporation or its managerial agent was reckless in employing or retaining him; (c) the employee was employed in a managerial capacity and was acting in the scope of employment; or (d) the corporation or its managerial agent ratified or approved the act of the employee." 233 Kan. at 994.

The complicity rule has been followed by this court in *Smith v. United Technologies*, 240 Kan. 562, 731 P.2d 871 (1987) (upholding punitive damage award against corporation based upon acts by managerial personnel in the scope of their employment); *Gould v. Taco Bell*, 239 Kan. 564, 571, 722 P.2d 511 (1986) (defendant corporation held liable for punitive damages where managerial personnel's acts were wanton); and *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653 (1984) (upholding award of punitive damages against corporation where corporate employer was liable for negligent hiring and also directed and ratified tortious acts of employee); see *Southern American Ins. v. Gabbert-Jones, Inc.*, 13 Kan. App. 2d 324, 769 P.2d 1194 (1989).

In 1987, the Kansas Legislature partially adopted the complicity rule set forth in *Kline*. K.S.A. 60-3701. Under the provisions of K.S.A. 60-3701(d), the legislature provided:

"In no case shall exemplary or punitive damages be assessed pursuant to this section against:

(1) a principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer."

While K.S.A. 60-3701 narrowed our holding in *Kline* by specifying that only under certain circumstances may punitive damages be assessed against an employer for the conduct of its employees, the statute partially expresses the complicity rule adopted by this court in *Kline*.

K.S.A. 60-3701(d)(1) limits punitive damages assessed to an employer only in circumstances where the employer has ratified or authorized the act of the employee. Since our decision in *Kline*, the policy of Kansas regarding assessment of punitive damages

against a corporation is that such damages may be assessed in accord with the complicity rule but not upon a vicarious liability rule.

The enactment of K.S.A. 40-2,115, after our decision in *Kline*, permits the purchase of insurance for punitive damages under a vicarious liability rule. K.S.A. 40-2,115 was passed in reaction to *Guarantee*, 228 Kan. 532, but the legislature did not consider our decision in *Kline*. *Kline* controls from the date of the decision in 1983. Since K.S.A. 40-2,115 was passed in 1984 and was based upon a vicarious liability rule, the statute has no effect in Kansas in cases where punitive damages are awarded on the basis of the complicity rule expressed in *Kline*. K.S.A. 40-2,115(a) conflicts with our decision in *Kline* and also conflicts with the provisions of K.S.A. 60-3701(d) passed by the Kansas Legislature in 1987.

In Kansas, a corporation may be held liabile for its own wanton acts. *Flint Hills Rural Elec. Co-op Ass'n v. Federated Rural Elect. Ins. Corp.*, 262 Kan. 512, 941 P.2d 374 (1997); *Cerretti v. Flint Hills Rural Electric Co-op Ass'n, 251 Kan. 347, 366, 837 P.2d 330* (1992). However, since our decision in *Kline*, and presently under the provisions of K.S.A. 60-3701(d), a corporation may not be held liable for the wanton acts of its employee unless under the complicity rule. There is no corporate employer liability under the complicity rule and K.S.A. 60-3701(d) "unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the . . . employer." K.S.A. 60-3701(d)(1). The provisions of K.S.A. 40-2,115(a) do not apply in this case.

There remains in Kansas, under the facts of this case, a policy against insurance coverage for punitive damages. That policy is best expressed in *St. Paul Surplus Lines Ins. Co. v. International Playtex, Inc.*, 245 Kan. 258, 273, 777 P.2d 1259 (1989):

"A finding that Kansas public policy does not apply to the punitive damages in the *O'Gilvie* action would effectively excuse [the corporate defendant] from the consequences of its reckless behavior within this state. Failure to apply Kansas law would establish an undesirable precedent for other tort and product liability action. . . . This would result in the uneven application of the public policy. Kansas tortfeasors would be required to feel the 'pecuniary punch' while out-of-state tortfeasors could require their 'guiltless' insurance companies to pay such damages. Out-of-state tortfeasors who contracted with out-of-state carriers would, therefore, not be subject to deterrence for committing reckless acts in Kansas."

The same Kansas policy also applies in the case of the driver, Printup:

"Where exemplary damages are awarded for purposes of punishment and deterrence, as is true in this state, public policy should require that payment rest ultimately as well as nominally on the party who committed the wrong; otherwise they would often serve no useful purpose. The objective to be attained in imposing punitive damages is to make the culprit feel the pecuniary punch, not his guiltless guarantor." *Koch*, 211 Kan. at 405.

The awards in this case apply separately to the employer and employee. As we said in *Smith v. Printup I*, 254 Kan. 315, 356, 866 P.2d 985 (1993): "Each wrongdoer is liable to pay the punitive damages assessed against him or her. The amount of the award is to be calculated with the individual defendant's financial status and conduct in mind. . . . Joint and several liability undermines these considerations and therefore is unavailable."

Permitting insurance coverage of the punitive damages for Red Ball and Printup in this case would violate Kansas law and public policy. This is particularly true in the case of Red Ball wherein liability is based upon the complicity rule set forth in K.S.A. 60-3701(d)(1). We conclude that Hartford's insurance policy does not cover the punitive damage awards against Red Ball or Printup. Accordingly, we reverse the part of the trial court's judgment holding that Hartford is liable for punitive damages awarded against Red Ball. In all other respects, we affirm the decision of the trial court.

Affirmed in part and reversed in part.